**Young Il KIM, Petitioner,**

v.

**OFFICE OF THRIFT SUPERVISION, Respondent.**

No. 93–70425.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 2, 1994.[*]

Decided Nov. 25, 1994.

---

[*] The members of the panel unanimously agree that this case is appropriate for submission on the briefs and without oral argument pursuant to Fed.R.App.P. 34(a) and 9th Cir.R. 34–4.

Robert P. Beckham, Horgan, Rosen, Beck-ham & Coren, Toluca Lake, CA, for petition-er.

Gary L. Goldberg, Office of Thrift Supervision, Washington, DC, for respondent.

Before: CANBY, LEAVY, and T.G. NELSON, Circuit Judges.

LEAVY, Circuit Judge:

A former bank officer petitions for review of an order issued by an administrative agency that forever bans him from working in the American banking industry. For the reasons which follow we grant the petition and vacate the order.

1. MACRO is an acronym standing for *M*anagement, *A*sset quality, *C*apital adequacy, *R*isk management and *O*perating results. It is a five-tiered system, with 1 being the highest and best rating.

## FACTS AND PRIOR PROCEEDINGS

Delta Savings Bank ("Delta") was a minority-owned, state-licensed savings and loan institution catering to the immigrant Asian community (i.e., principally Korean and Vietnamese families) in Southern California. Prior to September 1989, Delta had been an unprofitable bank: It had regularly reported losses of approximately $100,000 per month, and had failed to meet its minimum regulatory capital requirements since at least March 31, 1988.

On September 15, 1989, a group of local businessmen invested some $2.6 million of new capital in Delta and, two weeks later, took over the bank when their application for change of control was approved by the federal government. One of these investors, Young Il Kim ("Kim"), who initially put up $500,000 of his own money to acquire some of Delta's stock, became the bank's President and Chief Executive Officer. Yun Suk Seo ("Seo"), another investor, was elected Delta's Chairman of the Board. All of the investors, including Dr. Minh Ngoc Dang ("Dang") and Michael Kim (no relation to Kim), joined Delta's board of directors.

Delta began to prosper almost immediately after the new owners and managers took over. It started showing regular monthly gains within three months of the change of control; three months after that, the Office of Thrift Supervision ("OTS"), the regulatory and supervisory successor to the Federal Savings and Loan Insurance Corporation, awarded Delta a composite MACRO [1] rating of 3, an improvement over the previous year's rating of 4. Four months later (July 1990), the OTS rescinded its year-old Supervisory Agreement [2] in recognition of Delta's substantially improved position. By the end of 1990, Delta reported a $500,000 profit, 60% of which the Board voluntarily allocated to its loan loss reserves. Less than a year later,

2. The OTS apparently uses Supervisory Agreements to restrict the operations of troubled financial institutions. The OTS had imposed the Supervisory Agreement in question on Delta's former owners and managers on June 5, 1989.

Delta's financial position had improved to the point where it had tangible capital of $3.5 million and a capital ratio of 5.4%, *i.e.*, nearly a 30% improvement over the previous year's ratio of 4.2%. (The tangible capital requirement at the time was 1.5%.)

On November 8, 1991, things dramatically changed: The OTS filed a Notice of Charges ("Notice") against Kim, Seo, Dang, and Michael Kim, alleging that the four had violated banking laws and regulations, engaged in unsafe and unsound financial practices, and breached their fiduciary duties to the bank. Simultaneously with the filing of the Notice, the OTS issued an order temporarily removing Kim from office and seizing the assets of the institution. The OTS then placed Delta in a conservatorship under the Resolution Trust Corporation ("RTC"). Six months later (May 8, 1992), Delta went into RTC receivership.

Kim and Michael Kim [3] contested the Notice, leading to six days of hearings before an administrative law judge ("ALJ") in April and May 1992. On September 18, 1992, the ALJ issued a lengthy and detailed Recommended Decision and Order, including extensive findings of fact and conclusions of law. The ALJ determined that, while Delta's board of directors had engaged in some unsafe and unsound practices as evidenced by, *inter alia*, four questionable loans and the waiving of fees for one director's (Dang's) returned checks, no sanctions were recommended against either Kim or Michael Kim and no restitution was warranted.[4]

The OTS filed exceptions to the Recommended Decision, to which Kim and Michael Kim replied, and the matter was referred to the Acting Director ("AD") of the OTS. On

April 15, 1993, the AD issued an Order and Decision that adopted the ALJ's findings of fact and accepted his recommendation that neither Kim nor Michael Kim should be required to make any restitution. However, the AD's Order and Decision rejected that part of the ALJ's recommendation that no sanctions were warranted and issued a Prohibition Order, *i.e.*, an industry-wide ban against both former directors, forever prohibiting them from working in the American banking business. Kim has timely petitioned for review of that order; Michael Kim has not.

## ANALYSIS

Kim attacks the AD's imposition of an industry-wide Prohibition Order on two grounds: First, the Order and Decision was based on factual findings not supported by substantial evidence; and second, the Prohibition Order was arbitrary and capricious. With respect to the former contention, we note that Kim asserted no direct administrative challenge to the ALJ's findings of fact, which were adopted *in toto* by the AD.[5] Accordingly, the essence of Kim's argument for purposes of this appeal must be that, even taking those facts as given, the penalty imposed was arbitrary and capricious.

Our review of the AD's Order and Decision is based on 12 U.S.C. § 1818(h)(2), which states, in relevant part, that "[r]eview of such proceedings shall be had as provided in chapter 7 of Title 5[,]" *i.e.*, under the applicable provisions of the Administrative Procedure Act ("APA"). Specifically, "The reviewing

---

**3.** Actually, all four directors challenged the Notice, but Seo and Dang entered into separate settlement agreements with the OTS.

**4.** The ALJ found that at least one loan constituted both a statutory and a regulatory violation by exceeding the $500,000 limit for individual borrowers; that a $200,000 unsecured loan to Michael Kim constituted a commercial loan rather than a consumer loan and ran afoul of 12 C.F.R. § 563.43(b)(5); that Delta's failure to document certain director loans as having been made on the same terms and/or conditions generally avail-

able to the public constituted regulatory violations; that the waiving of late fees on one director loan, and the waiving of NSF charges for that same director's returned checks, involved unsafe and unsound banking practices (and, with respect to the former, constituted a regulatory violation as well); and that each of these transactions either did, or at least could have, cost Delta money.

**5.** This does not mean, however, that Kim agrees with the OTS's interpretation of those facts.

court shall [ ] hold unlawful and set aside agency action ... found to be [ ] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). As we recently noted,

> The APA does not give this court power "to substitute its judgment for that of the agency" but only to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." [*Citizens to Preserve] Overton Park[, Inc. v. Volpe],* 401 U.S. [402,] 416 [91 S.Ct. 814, 823–24, 28 L.Ed.2d 136] [1971]. We may reverse only if the decision was "arbitrary and capricious" within the meaning of the APA, 5 U.S.C. § 706(2)(A), in that

>> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, ·or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Beno v. Shalala,* 30 F.3d 1057, 1073 (9th Cir.1994) (quoting *Motor Vehicle Mfr. Ass'n v. State Farm Ins.,* 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)).

Title 12 of the United States Code, section 1818 states, in relevant part:

> (e) Removal and prohibition authority

> (1) Authority to issue order. Whenever the [OTS] determines that—

> (A) any institution-affiliated party has, directly or indirectly—

> (i) violated—

> (I) any law or regulation; [or]

> \*　　\*　　\*　　\*　　\*　　\*

> (ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution ...; or

> (iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty; [and]

> (B) by reason of the violation, practice, or breach described [above]—

> (i) such insured depository institution ... has suffered or will probably suffer financial loss or other damage; [or]

> (ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or

> (iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

> (C) such violation, practice, or breach—

> (i) involves personal dishonesty on the part of such party; or

> (ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution ..., the [OTS] may ... prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

12 U.S.C. § 1818(e)(1).

· In light of. the above, Kim obviously does not attempt to dispute the AD's *authority* to impose an industry-wide Prohibition Order against him; rather, Kim argues that the *decision* to·do so on these facts was arbitrary and capricious because Kim did nothing illegal, he did not profit from any of the actions complained of (indeed, he apparently lost his entire investment of $650,000), and Kim acted in reliance on the advice of legal counsel and the guidance of a former OTS official who joined Delta in 1990 as its Chief Operating Officer.[6]

▉ While it is true, as Kim argues, that he was charged with no criminal wrongdoing and that he did not personally profit from

---

**6.** Several months after the bank had already approved a $200,000 unsecured loan to Michael Kim, Delta sought the advice of legal counsel for the ostensible purpose of clarifying the OTS's regulatory distinction between commercial and consumer loans as applied to a bank's own officers and directors. Adrienne Miller, a former OTS examiner, joined Delta as its Chief Operating Officer in May 1990. Twelve days after being hired, Miller presented her draft of a "Conflict of Interest and Corporate Conduct" policy and procedures manual ("Miller Policy") stating, in relevant part, that Delta could make secured loans to its directors up to $500,000, and unsecured loans up to $300,000 (aggregate). Delta's Board of Directors, including Kim, unanimously approved the Miller Policy.

any of the above, the OTS was not required to prove such blatant misconduct in order for the AD to impose the blanket Prohibition Order authorized by 12 U.S.C. § 1818(e)(1). All that the OTS had to show was that Kim, as an "institution-affiliated party" (§ 1818(e)(1)(A)), at least "indirectly violated" (§ 1818(e)(1)(A)(i)) one or more banking "law[s] or regulation[s]" (§ 1818(e)(1)(A)(i)(I)), or "participated in . . . unsafe or unsound practice[s]" (§ 1818(e)(1)(A)(ii)), any one of which could have caused Delta to "suffer financial loss or other damage" (§ 1818(e)(1)(B)(i)), and that this conduct involved "willful or continuing disregard . . . for the safety or soundness" of Delta (§ 1818(e)(1)(C)(ii)).

■ Put somewhat differently, 12 U.S.C. § 1818(e)(1) requires the OTS to prove three things before it may lawfully impose a permanent Prohibition Order against a banker: (1) "misconduct" under § 1818(e)(1)(A); (2) "effect" under § 1818(e)(1)(B); and (3) "culpability" under § 1818(e)(1)(C). Because we find substantial evidence supports the OTS's showing of the misconduct and effect prongs of this test, the only question before us is whether or not the OTS also proved culpability; i.e., did Kim's conduct rise (or, perhaps more accurately, descend) to the level of a "willful or continuing disregard" for Delta's financial security? Although this Circuit has not yet discussed this question in any published decision,[7] other Circuits have.

In Seidman v. Office of Thrift Supervision, 37 F.3d 911 (3d Cir.1994), the Court of Appeals for the Third Circuit held that, before the OTS could impose the "ultimate administrative sanction" of a permanent Prohibition Order against a banker, it had to prove by substantial evidence that "(1) the banker has committed an unlawful act; (2) the act has either an adverse effect on the regulated institution or its depositors or confers a benefit on the actor and (3) the act is accompa-

nied by a culpable state of mind." Id. at 929–30 (footnote omitted).

Similarly, in Doolittle v. National Credit Union Admin., 992 F.2d 1531 (11th Cir. 1993), the Court of Appeals for the Eleventh Circuit held that "willful or continuing disregard" under section 1818(e)(1)(C)(ii) "must have the same magnitude as personal dishonesty." 992 F.2d at 1539 (citing decisions from the Fifth, Eighth, and D.C. Circuits). Accord Oberstar v. Federal Deposit Ins. Corp., 987 F.2d 494, 502 (8th Cir.1993) ("The more severe sanction of a Prohibition Order may only be imposed if the misconduct was more than inadvertent or technical," i.e., "the FDIC . . . must prove 'some scienter' to establish culpability."). Cf. Grubb v. Federal Deposit Ins. Corp., 34 F.3d 956, 961 (10th Cir.1994) (under the FDIC's interpretation of its own regulations, "continuing disregard" requires a showing of at least "heedless indifference to the prospective consequences").

These decisions all hark back to the Eighth Circuit's seminal opinion in Brickner v. Federal Deposit Ins. Corp., 747 F.2d 1198 (8th Cir.1984). In that case the court held that "willful disregard" and "continuing disregard" were to be viewed in the disjunctive as separate tests because of Congress's use of "or" between the two. 747 F.2d at 1202–1203. While acknowledging that "willful disregard" required a showing of a higher degree of culpability than "continuing disregard," the court noted that "some sort of scienter" was nevertheless required for the latter, i.e., "a mental state . . . akin to 'recklessness.'" Id. at 1203 & n. 6.

■ In light of the above, we conclude with our sister Circuits that, before the OTS may impose the ultimate sanction of a Prohibition Order against a banker that forever bans him or her from working in the American banking industry, the OTS must show a degree of culpability well beyond mere negligence, i.e., there must be a showing of scienter.

---

7. In Anaya v. Federal Home Loan Bank Bd., 839 F.2d 1349 (9th Cir.1988), we were confronted with the question of whether a former savings and loan officer could be banned from the banking industry by virtue of a Prohibition Order served on him after he had left the financial institution in question. We interpreted the rele-

vant provision of the National Housing Act, as codified and amended at former 12 U.S.C. § 1730(j)(2) (since repealed), as granting such authority to the administrative agency. In that case, however, the petitioner had conceded wrongdoing sufficient to warrant the imposition of a Prohibition Order.

■ Despite the OTS's vehement use of such colorful words as "egregious" to describe Kim's conduct, the materials provided show only that Kim was one of several officers and directors who approved a few questionable loans—from none of which he personally profited—out of literally hundreds of good loans, and that a few relatively minor and technical violations of certain banking regulations occurred while Kim was at Delta's helm. While the facts may very well have justified OTS's decision to place Delta in a conservatorship, and may have warranted the issuance of a temporary prohibition against Kim from continuing to manage Delta's affairs after November 8, 1991, Kim's conduct in no way involved anything approaching the level of culpability required by 12 U.S.C. § 1818(e)(1)(C), and certainly does not justify the imposition of such a draconian measure as a permanent Prohibition Order.

Because the facts do not support a showing of culpability on the third prong of the test laid out by 12 U.S.C. § 1818(e)(1), the AD's decision to impose a Prohibition Order against Kim cannot stand. Accordingly,

The Petition is GRANTED and the Prohibition Order is VACATED.