UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-60412

_____



ALTON B. LEWIS,

Petitioner

v.

FEDERAL DEPOSIT INSURANCE CORP.,

Respondent

_____

Petition for Review of an Order
of the Federal Deposit Insurance Corporation

(FDIC 96-65-E)

_____

February 2, 2001

Before KING, Chief Judge, PARKER, Circuit Judge, and KAZEN, District Judge.[1]

KAZEN, District Judge:*

　　Petitioner Alton B. Lewis ("Lewis") seeks review of an order by the Federal Deposit

---

[1]District Judge of the Southern District of Texas, sitting by designation.

*Pursuant to 5ᵀᴴ CɪR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵀᴴ CɪR. R. 47.5.4.

Insurance Corporation ("FDIC"), issued under 12 U.S.C. §1818(e).  That order essentially prohibited Lewis from further participation in the banking industry.  The FDIC concluded that Lewis breached his fiduciary duties to the First Guarantee Bank of Hammond, Louisiana, ("the Bank") by engaging in unsafe and unsound banking practices, which benefitted Lewis and harmed the Bank.  We vacate that order.

FACTUAL AND PROCEDURAL HISTORY

Petitioner Lewis is a member of the law firm Cashe, Lewis, Moody and Coudrain ("CLMC"), which heretofore represented the Bank.  Lewis also served on the Bank's Board of Directors, was Chairman of its Executive Committee, and a member of several other committees.

Beginning in the late 1980s, the Bank was experiencing severe financial difficulties.  It was in danger of having the FDIC terminate its federal deposit insurance, but the FDIC agreed to delay termination proceedings to allow the Bank to proceed with recapitalization plans.  One such plan was proposed by Rick A. Jenson, the bank president, along with Scott P. Crabtree, a salaried consultant, and Michael D. Landry, the senior vice-president and chief financial officer.  This proposal was called the "Pangaea Plan."  Although presented to the Board of Directors in August 1991 as a means of obtaining capital for the Bank, the Plan would actually allow its three originators to control the Bank through a holding company, without having to invest any money of their own.  After Board approval, the Bank forwarded a draft of the descriptive booklet to the FDIC, which eventually rejected it.  In the meantime, however, Jenson, Crabtree and Landry had traveled to Vancouver, British Columbia, to meet with prospective investors.  On August 26, 1991, the trio reported on their trip to the Executive Committee, and Jenson reported to the full Board on September 11, 1991.  With the FDIC still threatening to revoke the deposit insurance, Jenson was contacted by Fai Chan, a resident of Vancouver, who was interested in purchasing a

2

controlling interest in the Bank but not interested in the Pangaea Plan. When the FDIC was advised of Chan's interest, it agreed to forestall revocation of deposit insurance pending further negotiations. The FDIC also suggested that the Bank continue to seek other investments.

During that interim, in approximately October 1991, Jenson, Crabtree and Landry approached Lewis and discussed an investment opportunity based on recent changes in the federal immigration laws. These changes would allow foreign nationals to receive United States citizenship if they invested one million dollars in a new business venture which provided ten or more new employment positions. The parties conceived of a partnership, "Inter American Investment Service" ("IAIS"), in which Lewis' law firm would be an equal partner in return for performance of legal work. The concept would be for the partnership to locate interested foreigners, do the legal work necessary for them to meet the requirements of the law, and assist them in locating investment opportunities. In exchange, the partnership would be paid a fee by the assisted foreigner. IAIS envisioned using the Bank's then-dormant trust department as the depository for the foreign funds between the time they were paid and the time the appropriate investment opportunity was located. At some point, Lewis' law firm drafted proposed partnership articles, along with proposed articles of incorporation of Ameri-Invest, Inc., which would be the general partner of the partnership.

While this activity was occurring, Jenson continued negotiating with Chan but that deal never materialized. In September 1992, Jenson identified a group headed by Victor Weygard, which would recapitalize the Bank using a modification of the Pangaea Plan. Lewis advised against that plan, and it was rejected by the Executive Committee and the entire Board. Finally, one Marshall Reynolds offered to purchase the Bank. After several meetings of a special committee chaired by Lewis, the Reynolds plan was recommended to the board. In December

1992, Jenson and Crabtree were fired. Landry had previously tendered his resignation in September. The agreement with Marshall Reynolds was finalized in February of 1993. Eventually in 1996, the FDIC issued the Notice of Intent which is the subject of this action. Jenson, Crabtree and Dana Doucet, a bank loan officer, entered into consent agreements with the FDIC. Landry and Lewis went before an Administrative Law Judge in October 1997. That judge recommended an order of removal and prohibition which was approved by the FDIC board in May of 1999.

STATUTORY STANDARD FOR PROHIBITION OR REMOVAL

The statute, 12 U.S.C. §1818(e)(1), requires three factors in order to justify prohibition or removal of a bank-affiliated party: first, the offending party must have participated in unsafe or unsound practices, or have committed an act or omission constituting a breach of fiduciary duty; second, that conduct must have caused financial loss or other damage to the bank, or have caused financial gain or benefit to the offending party; third, the conduct of the party must involve either personal dishonesty or must demonstrate willful or continuing disregard for the safety or soundness of the bank. See Landry v. FDIC, 204 F.3d 1125, 1137 (D.C. Cir. 2000), *cert. denied*, 121 S.Ct. 298 (2000).

FDIC FINDING

The FDIC Board of Directors concluded that the ALJ found the necessary elements of 12 U.S.C. §1818(e)(1) to be established by a preponderance of the evidence, which is the appropriate standard under 5 U.S.C. §556(d). See Steadman v. SEC, 450 U.S. 91, 101 S.Ct. 999, 1004-09 (1981).

The FDIC determined that, "Lewis' imprudence in carrying out his roles as the Bank's attorney and director and his inattention to his duties as a director were both a breach of his

4

fiduciary duty and an unsafe and unsound practice...." The FDIC elaborated that as early as August 15, 1991, Lewis "became aware of the Pangaea Plan and should have understood its impact on the Bank." It observed that Lewis, through his law practice, began reserving the corporate name for the proposed holding company even though it had not been approved by the Bank's Board. It also found that Lewis authorized payment of travel vouchers "either without knowing why the Bank was paying these expenses, or in disregard of the reasons for the payment."

With respect to the IAIS partnership, the FDIC concluded that Lewis breached a fiduciary duty by failing to disclose a conflict of interest in that he and Jenson, members of the Bank's trust committee, were entering into a partnership "designed to profit from the services of the Trust Department." The FDIC specifically found that at a directors meeting on November 14, 1991, Lewis failed to make adequate disclosure of his role in the proposed IAIS partnership. This failure was deemed to be evidence of personal dishonesty. The FDIC further concluded that because of Lewis' "many important roles with the Bank," his denial of "the depth of his involvement with IAIS and Pangaea" constituted willful disregard for the safety of the bank.

ANALYSIS OF THE EVIDENCE

We review the FDIC Board's order under §706 of the Administrative Procedure Act. 5 U.S.C. §706. We are to determine whether the Board's findings are supported by substantial evidence, which is such relevant evidence that a reasonable person would deem adequate to support the ultimate conclusion. See Akin v. Office of Thrift Supervision, 950 F.2d 1180, 1183 (5th Cir. 1992); Grubb v. FDIC, 34 F.3d 956, 961 (10th Cir. 1994).

The "ultimate sanction of a Prohibition Order" against a banker requires a degree of culpability "well beyond mere negligence." Kim v. Office of Thrift Supervision, 40 F.3d 1050,

5

1054 (9th Cir. 1994). Removal of a bank officer is "an extraordinary power that should be carefully exercised in strict accordance with the law." In the Matter of Seidman,37 F.3d 911, 929 (3rd Cir. 1994).

One of the two critical premises of the ALJ's recommendation, adopted by the FDIC Board, is that after knowing the details of the Pangaea Plan, Lewis charged the Bank for reserving that corporate name with the Secretary of State and failed to promptly advise the Board of the scheme. The undisputed evidence is that this Plan was first presented to the Board of Directors at a meeting on August 8, 1991. Lewis was not present at that meeting. The Plan was clearly described as one to recapitalize the Bank. On August 12, 1991, Jenson sent to the FDIC a letter similarly describing the Plan, along with a draft of the Pangaea booklet. Lewis did not become aware of the Plan until August 15, 1991, when Jenson called him to the Bank late that afternoon. Jenson had prepared Federal Express packages said to contain Pangaea pamphlets and letters to various investment bankers in Vancouver. Jenson handed Lewis a copy of the Pangaea booklet but shortly retrieved it because there were only a limited number printed. Lewis testified that he did not examine the booklet carefully and had no reason to know, as the other directors also did not know, that the Plan was not as described to the Board. Jenson, Crabtree and Landry then went to Vancouver to meet with investment bankers as a follow-up to the Federal Express packages. On August 26, 1991, they met with the Executive Committee to report on the trip. Jenson distributed copies of the Pangaea booklet at that time but collected them at the end of the meeting. Lewis did not keep a copy.

Nevertheless, on the premise that Lewis should have known the contents of the booklet, the FDIC faulted him for not commenting on the true nature of Jenson's scheme. In Footnote 12 to its opinion, the FDIC Board describes the August 15 incident as one in which Lewis "approved

6

the distribution by Federal Express of 25 Pangaea packets to potential investors in Vancouver."

This is a significant distortion of the record. Lewis testified that he had no opportunity to read the Pangaea booklet on that occasion and was neither asked for nor did he give any advice about it. There is no evidence to the contrary. Under the actual circumstances presented by the evidence, Lewis' action of reserving the corporate name "Pangaea Corporation" at the request of the bank president, who was consistently representing this plan to be a needed recapitalization of the bank, can hardly be considered willful participation in an unsafe or unsound practice or breach of a fiduciary duty.

The other key premise of the ALJ, adopted by the FDIC, is that the IAIS partnership was designed to profit from the Bank's trust department, and that the true role of Lewis' law firm was never adequately disclosed to the Bank. In the first place, according to a lengthy memorandum of June 3, 1993, submitted to the FDIC by Landry, the Bank was never intended to have any role in this scheme, and the partnership intended to pay trust fees to the Bank for managing the foreign investments. Concerning the alleged failure to disclose Lewis' participation in the partnership, the minutes of a Board meeting of November 14, 1991, revealed that the proposal was discussed with the Board. Those minutes, found at FDIC Exhibit 76, contain the following entry:

> "President Jenson elaborated on a draft Trust Agreement to be used by a partnership whose purpose will be to attract monies into the United States under the US Immigration Act of 1990. The Bank may act as trustee for the individual trusts. He spoke of those participating in the partnership, the anticipated fees the Bank will earn for handling the trusts and the eligibility of those investing in the U.S. to apply for citizenship. All expenses associated with the trust will be borne by the partnership."

The minutes then reflect that the trust agreement was approved, with Jenson and Lewis abstaining. Notwithstanding those rather explicit minutes, supported by testimony from Lewis and at least one other director, the FDIC concluded that the disclosure to the board was

7

"insufficient" because two directors, testifying several years later, did not have a clear recollection that Lewis' law firm was intended to be a partner. More importantly, however, it is abundantly clear that this "partnership" was an idea that never came to fruition. The FDIC dismisses that fact with the observation that Louisiana law does not require a written partnership agreement. While that proposition might be true, it hardly seems persuasive when used as a key basis for the conclusion that Lewis' conduct was personally dishonest. The fact is that no partnership agreement was ever signed, no partner money was ever invested, and no foreign investors were secured.

On the strength of these two highly dubious premises--that Lewis "should have known" the truth of the Pangaea Plan in August 1991 and that the IAIS partnership was not fully disclosed to the Bank Board in November 1991--the FDIC concludes that Lewis' "abdication of his fiduciary responsibilities" enabled the Jenson trio to "hire and pay consultants, incur fees and expenses in furtherance of their personal goals without fear of being questioned or confronted." The FDIC order suggests that Lewis caused harm to the Bank by approving excessive travel vouchers submitted by the Jenson trio. The expenses approved by Lewis, however, involve the travels of Jenson as president of the Bank. Under the Bank's procedures, they were first approved by another Board member, who then submitted the vouchers to Lewis as Chairman of the Executive Committee. These expenditures were consistently represented as being part of the effort to obtain recapitalization of the Bank and were so regarded by the directors. The FDIC finds support for its conclusion of Lewis' willful disregard for the Bank's safety by citing his "many important roles with the Bank." That observation ignores the fact that several directors served on multiple Board committees, but were not similarly imputed with knowledge of the full scope of the Jenson trio's activities.

8

Indeed, as the Bank's recapitalization saga continued to unfold, it is clear that Lewis played a key role in restraining the adventures of Jenson and his confederates. When Jenson touted the so-called "Weygard Plan", a variation of the Pangaea Plan, Lewis advised that it was unacceptable as being unfair to the directors. That Plan was subsequently rebuffed by both the Executive Committee and the entire Board of Directors. Lewis also chaired a special committee charged with recommending the best recapitalization plan to the Bank. In the process, the scope of Jenson's self-dealing was unfolded. Lewis opposed Jenson's efforts to derail approval of the Marshall Reynolds proposal. Lewis and another director were ultimately given the assignment by the Executive Committee to carry out the decision to fire Jenson and Crabtree and suspend Doucet. Lewis was then named to a three-person committee to direct the Bank pending hiring of an interim president. Subsequently, Lewis and others defended four lawsuits filed against the Bank, its directors, and attorneys by Jenson and Crabtree. In 1993, after Marshall Reynolds and his partners injected $3 million in new capital, the other directors were offered a chance to participate and Lewis' law firm contributed $105,000.

The FDIC dismisses this history with the opinion that Lewis was only trying "to preserve his own interest in the Bank stock he and his law firm held." In view of its conclusion that just before those events, Lewis was participating in unsafe and unsound practices with willful or continuing disregard for the safety or soundness of the Bank, the FDIC appears to have put Lewis in a "heads we win, tails you lose" situation.

CONCLUSION

For the reasons discussed above, we conclude that there is not substantial evidence that the conduct of Appellant Lewis during the pertinent times involved either personal dishonesty or willful or continuing disregard for the safety or soundness of the Bank. Accordingly, we

9

VACATE the FDIC's Order to Remove and to Prohibit From Further Participation, dated May

25, 1999, insofar as it applies to Appellant Alton B. Lewis.

KING, Chief Judge, dissenting:


I would deny the petition of Alton B. Lewis for review of the order of the Federal Deposit Insurance Corporation prohibiting Lewis from further participation in the banking industry.  In my view, the panel majority has substituted its view of the evidence for that of the Administrative Law Judge who conducted an extensive evidentiary hearing on the charges against Lewis and for the view of the FDIC's Board of Directors which, in a lengthy and detailed opinion, adopted the ALJ's findings of fact and conclusions of law  and soundly rejected Lewis's position that he bore no responsibility for the dangerous banking practices and self-dealing that occurred here.  The Board's order is supported by substantial evidence, most of which is not even adverted to in the panel's opinion.  With respect, I dissent.