Michael D. LANDRY, Petitioner,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.**

No. 99–1230.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1999.

Decided March 3, 2000.

**1128**

John C. Deal argued the cause and filed the briefs for petitioner.

Kathryn R. Norcross, Counsel, Federal Deposit Insurance Corporation, argued the cause for respondent. With her on the brief were Ann S. DuRoss, Assistant General Counsel, and Colleen J. Boles, Senior Counsel. Thomas A. Schulz, Assistant General Counsel, and Ashley Doherty and Thomas L. Holzman, Counsel, entered appearances.

Before: EDWARDS, Chief Judge, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Separate opinion concurring in part and concurring in the judgment filed by Circuit Judge RANDOLPH.

STEPHEN F. WILLIAMS, Circuit Judge:

Congress has given the Federal Deposit Insurance Corporation ("FDIC") a variety of weapons to use against individuals whose actions threaten the integrity of federally insured banks or savings associa-

tions. Among these is the power to remove a bank officer from his position and to bar him from further participation in the operations of a federally insured depository institution. See 12 U.S.C. § 1818(e)(1). On April 30, 1996 the FDIC notified Michael D. Landry that it intended to seek such an order against him because of his conduct as Senior Vice President, Chief Financial Officer, and Cashier of First Guaranty Bank, Hammond, Louisiana.

As required by statute, the FDIC assigned the matter to an administrative law judge for a formal, on-the-record, administrative hearing. See 12 U.S.C. § 1818(e)(4); 5 U.S.C. §§ 554, 556. The ALJ held a two-week hearing and then issued a decision recommending that the FDIC issue the proposed prohibition order.[1] Landry filed exceptions to the ALJ's recommendation, and the case was forwarded to the FDIC's Board of Directors for a final decision. The Board agreed with the recommendation and issued an order of removal and prohibition. See *In re Michael D. Landry*, FDIC 95–65e, May 25, 1999 ("Order"), Joint Appendix ("J.A.") 218, 264–66. Landry filed a timely petition for review. The principal issue for review is Landry's argument that the FDIC's method of appointing ALJs violates the Appointments Clause of the Constitution, Art. II, § 2, cl. 2. Landry also argues that the evidence against him did not meet the statutory minimum for the remedies against him and that the FDIC violated various procedural requirements. We affirm.

\* \* \* \* \* \*

From the late 1980s to early 1993, First Guaranty was in serious financial trouble. In 1990, the FDIC issued a capital directive requiring it to obtain a $4.7 million infusion of capital by January 1, 1991.

---

1. In the same proceedings, FDIC enforcement counsel also sought, and ultimately received, a prohibition order against Alton B. Lewis, a member of the Bank's Board of Directors who also did some legal work for the bank. Lewis's petition for review is pending before the United States Court of Appeals for the Fifth Circuit. See *Lewis v. FDIC*, No. 99–60412 (5th Cir. filed June 18, 1999).

The Bank tried unsuccessfully to raise capital through a stock solicitation, and when the FDIC completed its 1991 examination the Bank's position looked bleaker than ever. Soon afterward, the FDIC told the Bank's board of directors that it would seek to terminate the Bank's deposit insurance. It agreed, however, to delay termination proceedings while further recapitalization plans proceeded. In early 1992 the FDIC conducted another examination and found that the Bank's financial position had improved slightly, but that it was still a candidate for near term failure. After Landry and others pursued a series of attempts to add capital to the Bank—some of which can only be described as bizarre and desperate—the Bank's board on September 17, 1992 accepted an offer of purchase, and in December 1992 the Bank received the necessary capital infusion.

Landry's alleged malfeasance occurred in connection with a capital enhancement plan initially proposed by Rick A. Jenson, the Bank's former president, and Scott Crabtree, a consultant, involving a corporation called Pangaea. The FDIC and Landry agree that he had a role in this plan but disagree as to the scope of his role, his motivation, and the significance of his conduct. The FDIC Board, adopting the ALJ's factual findings, found that Landry and his two associates were the incorporators of Pangaea Corporation, and that they planned to use Pangaea to acquire an 80% interest in the Bank. They hoped to raise $16 million by selling 30% of Pangaea's stock, retaining 70% for themselves. Of the $16 million Pangaea would use $7.5 million to beef up the Bank's capital through purchases of its stock, $6.5 million to form a limited partnership to buy real estate from the Bank's portfolio, and $2 million to pay Pangaea expenses and to finance other ventures. They presented this plan as a means of finding capital for the Bank, and obtained approval at an executive meeting of the Bank's board of directors on August 8, 1991, but as Landry would later admit, the board was misled because the plan was "not presented as a management takeover/buyout of the Bank." Instead, the Bank's board was led to believe that Pangaea was an arm of the Bank so that a capital infusion would entail no genuine change in control of the Bank. After board approval, the Bank forwarded a draft copy of a descriptive booklet to the FDIC examiners. They rejected the plan because they believed it offered no short term capital infusion and Pangaea had no serious prospect of actually raising the $16 million. (The FDIC had determined that investors could have acquired complete ownership of the entire bank for $5 million, so that investors would not be willing to pay $16 million for a 30% interest in an entity (Pangaea) that would own only 80% of the Bank.)

Undeterred, Jenson, Crabtree and Landry pursued a variety of imaginative sources of capital, many of which involved Pangaea. These sources included: individuals seeking United States citizenship under a provision of the immigration laws admitting individuals who invest $1 million in a new business venture that creates ten or more new jobs; pension funds solicited for the immigration scheme with the help of an image-enhancement firm with pension fund contacts; a preferred stock offering for Pangaea prepared by Funding Placement Services; and an Ecuadorian currency scheme through which one could purportedly obtain a 500% return in six weeks.

Although this "Pangaea plan" never much developed, and although Pangaea was unlikely ever to have received approval to acquire the Bank from its board of directors or federal regulators, the FDIC Board found that Landry's fellow Pangaea incorporators—with Landry's full knowledge and cooperation—executed enough of the plan to cause the Bank to lose substantial sums of money in the form of promotional expenses, see Order at 14, 17–18, 29–30, J.A. at 231, 234–35, 246–47, questionable loans, see *id.* at 14–15, 17, J.A. 231–32, 234, and other unwise or illegal banking activities, see *id.* at 13, 16, 20, J.A. at 230, 233, 237, without informing the

directors that their plan was designed to enrich the incorporators while providing little or no benefit to the Bank itself. The Board also found Landry had failed to satisfy FDIC rules requiring disclosure of material changes in the Bank's operations. See Order at 20, J.A. at 237.

The Board's most compelling evidence came in the form of a 16–page letter dated June 3, 1993 that Landry himself wrote to bank examiner G. Martin Cooper ("Landry letter"), and to which he attached more than 500 pages of supporting material. The Landry letter described the activities at issue here and linked them to Pangaea. Landry's personal culpability, laid bare in this letter, was reinforced by Landry's resignation letter (not accepted by the Bank's board of directors), in which he described his conduct as "self dealing" and "for the good of Pangaea Corporation at the expense of First Guaranty Bank," as well as his May 12, 1995 deposition, in which he admitted that Pangaea had become a vehicle to "make money off the bank." After examining all of the evidence, the FDIC Board concluded that although other wrongdoers may have been more culpable, Landry's conduct met the statutory criteria and thus warranted a removal and prohibition order. See Order at 21–22, J.A. at 238–39.

### Appointments Clause

Landry argues that the FDIC's method for appointing ALJs violates the Appointments Clause of the Constitution:

[The President] ... shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., Art. II, § 2, cl. 2.

Landry would classify ALJs who conduct administrative proceedings for the various federal banking agencies as "inferior officers" of the United States. If so, Congress's instruction to the banking agencies to "establish their own pool of administrative law judges" to conduct such hearings, see Federal Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), § 916, 103 Stat. at 486, codified at 12 U.S.C. § 1818 note, would be unconstitutional because it vests appointment authority in a set of agencies that are not (according to Landry) "departments" under the Appointments Clause. The FDIC counters that the ALJs in question need not be appointed by heads of departments because they are employees rather than inferior officers.

The FDIC also makes a preliminary objection—that Landry has shown no prejudice from any Appointments Clause violation that may have occurred. The FDIC itself determined Landry's responsibility after reviewing the ALJ's recommended decision de novo. See 12 U.S.C. § 1818(h)(1) (requiring the FDIC to make its own findings of fact when issuing its final decision); 12 CFR §§ 308.38, 308.40 (requiring the FDIC Board to issue the agency's final decision). The Supreme Court has not decided whether an Appointments Clause violation requires reversal where it appears to have done a party no direct harm. *Ryder v. United States,* 515 U.S. 177, 182–83, 186, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995). But in *Freytag v. Commissioner,* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), in reaching the Appointments Clause issue despite its not having been raised below, the Court classified the clause as "structural," because of its purpose to prevent encroachment of one branch on another and to preserve the Constitution's structural integrity. *Id.* at 878–79, 111 S.Ct. 2631. Here, of course, the issue was raised all right; the problem is that Landry's injury may be questionable. But the Court uses the term "structural" for a set of errors for which no direct injury is necessary—such as a criminal defendant's indictment by a grand jury chosen in a

racially or sexually discriminatory manner. See *Vasquez v. Hillery,* 474 U.S. 254, 261 & n. 4, 263, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (race); *Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (sex). In such cases, of course, the later conviction by a petit jury supplies virtual certainty that a properly constituted grand jury would have indicted, as the Court has observed in regard to lesser ranking grand jury errors. See *United States v. Mechanik,* 475 U.S. 66, 70–71 & n. 1, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). As grand juries do not draft opinions for the petit jury, the latter's insulating effect is positively surgical compared to the FDIC's action here, however independent its review of the ALJ's decision.

The Court recently noted its use of the label "structural," observing that only in a limited class of cases has it "found an error to be 'structural,' and thus subject to automatic reversal." *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999). Issues of separation of powers (including Appointments Clause matters, *Freytag,* 501 U.S. at 878, 111 S.Ct. 2631), seem most fit to the doctrine; it will often be difficult or impossible for someone subject to a wrongly designed scheme to show that the design—the structure—played a causal role in his loss. And in *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the Court gave a further explanation: "[S]eparation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified.... [I]t is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Id.* at 239, 115 S.Ct. 1447. For Appointments Clause violations, demand for a clear causal link to a party's harm will likely make the Clause no wall at all.

There is certainly no rule that a party claiming constitutional error in the vesting of authority must show a direct causal link between the error and the authority's ad-verse decision. In fact, the opposite is often true. For example, in a challenge to the authority of a non-Article III court on the grounds that the challenger is entitled to a court enjoying Article III's exceptional tenure provisions, the assumption that inadequate tenure may prejudice the challenger is so automatic that it usually goes unmentioned. See *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), extended this principle to general separation-of-powers claims. Although the union plaintiffs there had clearly been injured by a suspension and proposed cancellation of their cost-of-living adjustments, see *id.* at 721, 106 S.Ct. 3181, there was no showing that the Comptroller General's exposure to removal by Congress in any way increased the probability of the cuts. Instead, the Court seemed to presume that subtle variations in the quality of tenure would affect conduct. See also *Ryder,* 515 U.S. at 182–83, 186–88, 115 S.Ct. 2031.

■ Of course in the above cases there was no de novo review following the decision of the (arguably) unlawfully designated official. (But see *Vasquez v. Hillery,* 474 U.S. at 261 & n. 4, 263, 106 S.Ct. 617, and *Ballard v. United States,* 329 U.S. at 195, 67 S.Ct. 261, reversing convictions based on indictment by discriminatorily selected grand jury, despite later petit jury verdict, discussed above at 6–7.) Here there is. But *Freytag* itself indicates that judicial review of an Appointments Clause claim will proceed even where any possible injury is radically attenuated. There, the Court made plain that, had it not found the "inferior officer" appointed in a constitutional way, it was ready to throw out the Tax Court's decision simply on the ground that special trial judges ("STJs") held what it viewed as clearly the powers of an "infe-

rior officer" (to make final decisions), even though the STJ had not exercised any power to make final decisions in Freytag's case. See 501 U.S. at 871–72 & n. 2, 882, 111 S.Ct. 2631. Indeed, the Court made no attempt to explain how the STJ's possession of powers *not used* in Freytag's case could possibly have prejudiced him. *Id.*

Moreover, Appointments Clause analysis of purely decision recommending employees presents a special problem. Suppose that a purely recommendatory power, i.e., one followed as here by de novo review, *can* make an employee an "inferior officer" within the meaning of the Appointments Clause—a hypothesis we must assume at this stage. If the process of final de novo review could cleanse the violation of its harmful impact, then all such arrangements would escape judicial review, unless the officer's powers happened fortuitously, as in *Freytag*, to be combined with still greater powers. Recognition of this problem may well explain the Court's statement in *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), that a defect in the appointment of an "examiner" (precursor of today's ALJ) was, if properly raised, "an irregularity which would invalidate a resulting order." *Id.* at 38, 73 S.Ct. 67. Thus, to refuse to entertain Landry's claim is to rule, in effect, that officers holding purely recommendatory powers subject to de novo review are not "inferior officers," i.e., it is to resolve the merits without purporting to do so.

For this reason our decision here is not inconsistent with *Doolin v. OTS*, 139 F.3d 203 (D.C.Cir.1998). There we relied on *Mechanik*, 475 U.S. at 70–71, 106 S.Ct. 938, to conclude that although enforcement proceedings culminating in a "cease and desist order" were initiated by an improperly appointed Director of the OTS and therefore defective, the ultimate issuance of the final merits order by a properly appointed Director ratified the initiation and cured the error. *Doolin*, 139 F.3d at 212–14. But *Doolin* did not present the catch–22 of the present case, where the

government's argument requires one to believe that, even if we assume that a pure power to recommend is enough to lift an employee into the august "inferior officer" realm, it is not enough to taint the ultimate judgment and thus give the loser a chance to raise the issue.

Finally, we note that in *United States v. Colon–Munoz*, 192 F.3d 210 (1st Cir.1999), the First Circuit said that "structural" has two meanings, referring not only to errors related to the constitutional structure but also to ones simply deemed so "fundamental" as to deprive a criminal trial of basic fairness. *Id.* at 217–18 n. 9. The court used the distinction to justify not applying *Freytag*'s rejection of the waiver argument, a problem not before us. But *Colon–Munoz* never passed on the issue that is before us—whether an issue that is structural in the sense that it derives from the constitutional structure can be reviewed even where the link between the error and the party's harm is conjectural.

We now turn to whether a violation of the Appointments Clause occurred. The line between "mere" employees and inferior officers is anything but bright. See Nick Bravin, Note, Is *Morrison v. Olson* Still Good Law? The Court's New Appointments Clause Jurisprudence, 98 Colum. L.Rev. 1103, 1114–15 (1998) ("Early Supreme Court attempts to define the term 'officer' provide inexact, if any, judicially manageable standards"); Edward Susolik, Note, Separation of Powers and Liberty: The Appointments Clause, *Morrison v. Olson*, and Rule of Law, 63 S. Cal. L.Rev. 1515, 1545 (1990) ("[A] definitive understanding of the term 'officer' is not forthcoming for two simple reasons: (1) there are too few cases for any consistent precedential principle to be articulated, and (2) the few cases that do exist posit conclusions rather than arguments and provide little insight to justify their results."). In fact, the earliest Appointments Clause cases often employed circular logic, granting officer status to an official based in part upon his appointment by the head

of a department. See, e.g., *United States v. Mouat*, 124 U.S. 303, 307, 8 S.Ct. 505, 31 L.Ed. 463 (1888) ("Unless a person in the service of the Government ... holds his place by virtue of an appointment by the President, or of one of the courts of justice or heads of Departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States"); *United States v. Germaine*, 99 U.S. 508, 510, 25 L.Ed. 482 (1878); *United States v. Hartwell*, 73 U.S. (6 Wall) 385, 393, 18 L.Ed. 830 (1867). In an attempt to clarify the inquiry, the Court has often said that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,'" *Buckley v. Valeo*, 424 U.S. 1, 126 n. 162, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also *Edmond v. United States*, 520 U.S. 651, 662, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997); *Ryder v. United States*, 515 U.S. 177, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995); *Freytag*, 501 U.S. at 881–82, 111 S.Ct. 2631,[2] but ascertaining the test's real meaning requires a look at the roles of the employees whose status was at issue in other cases.

■ In the most analogous case, *Freytag*, the Court decided that STJs were inferior officers. 501 U.S. at 881–82, 111 S.Ct. 2631. In so finding, the Court relied on authority of the STJs not matched by the ALJs here. In particular, the Court noted that STJs have the authority to render the *final* decision of the Tax Court in declaratory judgment proceedings and in certain small-amount tax cases. See *id.* at 882, 111 S.Ct. 2631. But the ALJs here can never render the decision of the FDIC. See 12 CFR § 308.38 (noting that ALJs must file a *"recommended* decision, *recommended* findings of fact, *recommended*

conclusions of law, and [a] *proposed* order" (emphasis added)). Final decisions are issued only by the FDIC Board of Directors. See 12 CFR § 308.40(a), (c). Moreover, even for the non-final decisions of the type made by the STJ in *Freytag*, the Tax Court was required to defer to the STJ's factual and credibility findings unless they were clearly erroneous, see Tax Court Rule 183(c), 26 U.S.C.App. (1994); *Stone v. Commissioner*, 865 F.2d 342, 344–47 (D.C.Cir.1989), whereas here the FDIC Board makes its own factual findings, see 12 U.S.C. § 1818(h)(1); 12 CFR § 308.40(c); see also *In re Landry*, FDIC–95–65e, 1999 WL 639568, at *1 (FDIC July 8, 1999) (noting that the FDIC had given Landry's case "an exhaustive de novo review"). Landry argues that the FDIC Board did not undertake a de novo review of his case, but his characterization of the FDIC's work goes only to its carefulness, not its authority.

It is, to be sure, uncertain just what role the STJs' power to make final decisions played in *Freytag*. Many of the features of the STJ job that the Court found to contribute to its being covered by the Appointments Clause have analogues here. The office of STJ was "established by Law" (the threshold trigger for the Appointments Clause) and the "duties, salary, and means of appointment" for the office were specified by statute, a factor that has proved relevant in the Court's Appointments Clause jurisprudence. *Freytag*, 501 U.S. at 881, 111 S.Ct. 2631. The ALJ position here is also "established by Law," as are its specific duties, salary, and means of appointment. See 5 U.S.C. § 5372 (pay scales for ALJs); 5 U.S.C. § 3105 (hiring practices); 5 U.S.C. §§ 556–557 (functions); 12 CFR pt. 308 (same). Similarly,

2. In its Order, the Board seemed to agree with Landry that the ALJs were inferior officers but found this status irrelevant because the federal banking agencies are "departments" capable of accepting Congress's delegation of appointment power. The FDIC has abandoned its apparent concession and now argues that the ALJs are not inferior officers. Because we agree that the ALJs in question

are not inferior officers we need not decide whether any of the federal banking agencies are in fact "departments" for purposes of the Appointments Clause. Moreover, because the issue before us does not depend on the FDIC's interpretation of the statute or exercise of its discretion, there is no problem under *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

both the ALJs here and the STJs in *Freytag* "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag,* 501 U.S. at 881–82, 111 S.Ct. 2631. And, the Court observed, "In the course of carrying out these important functions, the special trial judges exercise significant discretion," *id.* at 882, 111 S.Ct. 2631, rather a magic phrase under the *Buckley* test. Further, the Court introduced mention of the STJs' power to render final decisions with something of a shrug: "Even if the duties" of STJs involving conduct of nonfinal proceedings "were not as significant as we and the two courts [Tax Court and Fifth Circuit] have found them to be, our conclusion would be unchanged." *Id.* Only then did it go on to discuss the STJs' power to make final decisions.

Nonetheless, in another way the Court laid exceptional stress on the STJs' final decisionmaking power. After noting those powers, the Court went on to explain why Freytag could raise the claim even though in his case the STJ had *not* been exercising them:

> Special trial judges are not inferior officers for purposes of some of their duties under [the enabling statute], but mere employees with respect to other responsibilities. The fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution.

*Id.* All this explanation would have been quite unnecessary if the purely recommendatory powers were fatal in themselves. Accordingly, we believe that the STJs' power of final decision in certain classes of cases was critical to the Court's decision. As the ALJs hired pursuant to § 916 of FIRREA have no such powers, we conclude that they are not inferior officers.

### Privilege and Brady/Jencks *claims*

During pre-trial discovery the FDIC asserted claims of deliberative process, law enforcement, and attorney-client privilege in various permutations to justify withholding 97 documents. As required by the FDIC's rules, see 12 CFR § 308.25(e), FDIC enforcement counsel produced a privilege log which briefly described each document and indicated its date, author, and recipient and the privileges claimed. In addition, enforcement counsel produced the affidavit of Cottrell L. Webster, the Memphis regional director of the FDIC's division of supervision, claiming to have personally reviewed each of the withheld documents, formally invoking the law enforcement and deliberative process privileges, and explaining how each privilege applied.

The ALJ rejected an initial effort to compel production of the documents, and the FDIC denied interlocutory review. It specifically rejected Landry's claim that there were documents that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), required the FDIC to disclose. In doing so it observed that enforcement counsel's assurance that no such withheld documents existed was enough to defeat Landry's claims in the absence of some source of doubt rising above Landry's unadorned "suspicions." The ALJ also denied several requests to compel production made during the hearing itself. But when the hearing was over, the FDIC Executive Secretary ordered that the record be reopened and that FDIC enforcement counsel submit a more detailed privilege log. After reviewing the revised privilege log, the Board upheld the assertion of privilege for 44 of the documents but reopened the record a second time and ordered enforcement counsel to produce the remaining 46 documents (seven had been produced to Landry for other reasons) for in camera inspection.

After reviewing the newly submitted documents, the Board found most of them not to be privileged but did not order disclosure because it found the error harmless in light of the cumulative nature of the information withheld. See Order at 5–6, 51–52, J.A. at 223–24, 268–69. The

FDIC Board did not address any of Landry's claims under *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Because the FDIC had not ruled on Landry's *Brady* and *Jencks* claims for the documents that it did *not* review in camera, we ordered the FDIC to produce these documents so that we could decide whether material had been withheld improperly.

■ *Privilege.* We begin with Landry's challenges to the FDIC's claims of privilege. His most substantial argument is that the deliberative process and law enforcement privileges were not properly invoked. Assertion of either of these qualified, common law executive privileges requires: (1) a formal claim of privilege by the "head of the department" having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege. See *In re Sealed Case,* 856 F.2d 268, 271 (D.C.Cir. 1988) (noting the requirements for invoking the law enforcement privilege); *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 399 (D.C.Cir.1984) (same for deliberative process privilege). Landry's argument is that assertion merely by the Memphis regional director of the FDIC's division of supervision, Cottrell L. Webster, rather than by the head of the FDIC, is inadequate.

■ The argument mistakenly assumes that only assertion by the head of the *overall* department or agency is enough. Our cases hold to the contrary. In *Tuite v. Henry,* 98 F.3d 1411 (D.C.Cir.1996), we allowed Counsel to the Justice Department's Office of Professional Responsibility, rather than the Attorney General herself, to assert the law enforcement privilege for information obtained during investigations of potentially illegal Justice Department recordings of conversations between a defendant and his lawyer. See *id.* at 1417. Similarly, in *Friedman*

*v. Bache Halsey Stuart Shields, Inc.,* 738 F.2d 1336 (D.C.Cir.1984), in rejecting enforcement counsel's assertion of the law enforcement privilege, we implied that officials other than the head of the department could assert the privilege, stating: "the files had not been examined for this purpose by *responsible members or officers* of CFTC." *Id.* at 1342 (emphasis added); see also *Kerr v. United States Dist. Ct. for North. Dist. of Cal.,* 511 F.2d 192, 198 (9th Cir.1975) (finding common law executive privilege inapplicable because "[n]either the Chairman of the [California Adult] Authority nor the Director of Corrections *nor any official of these agencies* asserted, in person or writing, any privilege in the district court" (emphasis added)), *aff'd,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). District courts in this Circuit have also allowed lesser officials to assert these privileges. See, e.g., *Koehler v. United States,* 1991 WL 277542, at *5 (D.D.C. Dec.9, 1991) (allowing the head of the U.S. Army Criminal Investigation Command to assert privilege); *Alexander v. FBI,* 186 F.R.D. 154, 166 (D.D.C.1999) (implying that affidavits of FBI general counsel or inspector general would have been sufficient if they had provided enough information to assess whether the law enforcement privilege applied).

For these privileges, it would be counterproductive to read "head of the department" in the narrowest possible way. The procedural requirements are designed to "ensure that the privilege[s are] presented in a deliberate, considered, and reasonably specific manner." *In re Sealed Case,* 856 F.2d at 271. As we have seen, built into the requirements is the need for "actual personal consideration" by the asserting official. *Id.* Insistence on an affidavit from the very pinnacle of agency authority would surely start to erode the substance of "actual personal" involvement. See generally Note, The Military and State Secrets Privilege: Protection for the National Security or Immunity for the Executive?, 91 Yale L.J. 570, 572 n.18 (1982)

(noting widespread belief that official claims of privilege by department heads are often made after perfunctory review of subordinates' decisions). Further, both privileges advance important goals; the gains from imposing demands in the interest of careful assertion must be balanced against the losses that would result of imposing superstringent procedures. See *United States Dep't of Energy v. Brett,* 659 F.2d 154, 155–56 (Temp. Emer. Ct.App. 1981).

Under our cases, the head of the appropriate regional division of the FDIC's supervisory personnel is of sufficient rank to achieve the necessary deliberateness in assertion of the deliberative process and law enforcement privileges.

We note that decisions involving the more sensitive and absolute privilege for state and military secrets have been more insistent on assertion at the highest level. See, e.g., *United States v. Reynolds,* 345 U.S. 1, 7–8 n. 20, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (quoting *Duncan v. Cammell, Laird & Co.,* [1942] A.C. 624, for the proposition that the decision to invoke the state secrets privilege should be taken by "the minister who is the political head of the department"); *Clift v. United States,* 597 F.2d 826, 829 (2d Cir.1979) (declining to require disclosure where the Secretary of Defense did not invoke the privilege because of a statute criminalizing such disclosure but noting "the Government would be wiser not to put courts to this test in the future"); *Kinoy v. Mitchell,* 67 F.R.D. 1, 9–10 (S.D.N.Y.1975) (requiring Attorney General himself to lodge a formally sufficient claim of privilege); 26 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5670 (1992). We express no opinion on who may assert that privilege.

■ Landry's claim that the FDIC fell fatally short by not including the disputed documents in the record is meritless. See *Vaughn v. Rosen,* 484 F.2d 820, 825–26 (D.C.Cir.1973) (noting the immense and unjustifiable cost to the appellate courts of mandatory review of documents for privi-

leged material). But see *Kerr v. United States Dist. Ct. for North. Dist. of Cal.,* 426 U.S. 394, 405–06, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (noting that in camera review may be used to resolve a privilege dispute).

■ Landry also argues that the FDIC waived its privileges by initiating this action. He is mistaken. Here he relies on an erroneous reading of *In re Subpoena Duces Tecum Served on the OCC,* 145 F.3d 1422 (D.C.Cir.), *reh'g granted,* 156 F.3d 1279 (D.C.Cir.1998). In our first pass at the case, we said that the deliberative process privilege was unavailable where "the Constitution or a statute makes the nature of governmental officials' deliberations *the* issue," offering Title VII cases as an archetypal instance. See 145 F.3d at 1424. But when the government in petition for rehearing expressed anxiety that any claim of arbitrary and capricious decisionmaking would necessarily call the government's deliberations into question, we responded by explaining that "our holding ... is limited to those circumstances in which the cause of action is directed at the agency's subjective motivation." 156 F.3d at 1280. Because an ordinary enforcement action in no way implicates the FDIC's subjective motivations, and Landry makes no credible claims that improper factors motivated this enforcement action, there is no waiver.

*Brady/Jencks.* In its order the FDIC Board assumed without deciding that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), applies to enforcement proceedings, and though the Board's order did not address *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), FDIC counsel assures us that the FDIC has the same view of it. Thus we also assume without deciding that both cases apply. Cf. *Communist Party of the United States v. Subversive Activities Control Bd.,* 254 F.2d 314, 327–28 (D.C.Cir.1958) (holding that in agency adjudications in which the government has not claimed privilege, written reports made at the time of an event must be

produced when the credibility of the witness on matters discussed in the report is in question). After reviewing the documents alleged to contain *Jencks* and *Brady* material, we find no reason to disturb the FDIC's order.

■ We begin with *Brady*. After Landry requested that the FDIC produce all *Brady* materials, the government informed the ALJ and the FDIC Board that it had reviewed the contested documents and had disclosed all exculpatory factual material. Normally we accept the government's representations as to whether documents in its possession constitute *Brady* material. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (noting that a prosecutor's decision as to whether exculpatory *Brady* information exists or is material is usually final); *United States v. Lloyd*, 992 F.2d 348, 352 (D.C.Cir.1993) (same). As the FDIC observed in denying interlocutory review, it takes more than the adverse party's conclusory suspicions to impel the adjudicator to delve behind the government's representation that it has conducted a *Brady* review and found nothing.

■ Landry's *Jencks* claims have more merit. He argues that the withheld reports by Jerry Cox and G. Martin Cooper, the bank examiners who testified at his hearing, touch upon the events and activities discussed in their testimony and therefore must be produced. See *Jencks*, 353 U.S. at 668, 77 S.Ct. 1007. Because the FDIC concedes *Jencks*'s applicability in this case, Landry has established a prima facie violation if the documents in question cover the same territory as the examiners' testimony. After examining the documents and the examiners' testimony we find that several of them do so. Even so, a privilege might beat the *Jencks* claim. See *Norinsberg Corp. v. USDA*, 47 F.3d 1224, 1229 n. 5 (D.C.Cir.1995) (presuming that, in a license revocation hearing in which the agency had adopted the Jencks Act, a witness's opinions in a report that formed part of the deliberative process would be protected from Jencks Act disclo-

sure); see also *Communist Party*, 254 F.2d at 327. But see *Jencks*, 353 U.S. at 671–72, 77 S.Ct. 1007 (noting that criminal actions must be dismissed when the government chooses not to comply with a court order to produce relevant statements or reports on the ground of privilege). But the FDIC here makes no claim that privilege defeats its *Jencks* obligations—though the ALJ did.

The FDIC does, however, claim harmless error, and the claim is sound. Because these documents merely duplicate other evidence in the record, we find the error harmless even under the strict application of harmless error used to assess *Jencks* violations. See *Norinsberg Corp.*, 47 F.3d at 1230; *United States v. Lam Kwong–Wah*, 924 F.2d 298, 310 (D.C.Cir. 1991).

### Evidence Satisfying the Statutory Standard

■ The statute authorizes a prohibition or removal order:

Whenever the [FDIC] determines that—

(A) any institution-affiliated party has, directly or indirectly—

. . . . .

(ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

(iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

(B) by reason of the violation, practice, or breach described in . . . subparagraph (A)—

(i) such . . . institution . . . has suffered or will probably suffer financial loss or other damage;

. . . . .

(iii) such party has received financial gain or other benefit by reason of such violation . . . ; and

(C) such violation, practice, or breach—

(i) involves personal dishonesty on the part of such party; or

(ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such ... institution....

12 U.S.C. § 1818(e)(1) (1994). That is, the statute requires: misconduct, with certain adverse effects, committed with a culpable state of mind. Landry argues that each of these three factors is absent.

◼ *Misconduct.* The Board ruled that Landry's actions constituted both unsafe and unsound banking practices under § 1818(e)(1)(A)(ii) and breaches of his fiduciary duty under § 1818(e)(1)(A)(iii). Because there is significant overlap between the two categories, see *Kaplan v. OTS,* 104 F.3d 417, 421 & n. 2 (D.C.Cir.1997) (recognizing that both involve undue risk and that a fiduciary breach can qualify as an unsafe or unsound practice), it is unsurprising that the Board found that most of Landry's misconduct fit into both categories. Landry argues that fiduciary breach is a matter of state rather than federal law, an issue we left open in *Kaplan v. OTS,* 104 F.3d 417, 421 n. 2 (D.C.Cir.1997); see also *Atherton v. FDIC,* 519 U.S. 213, 217–26, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), as we do again today: the evidence is enough to show his participation in unsafe or unsound practices.

◼ In *Kaplan* we suggested that an "unsafe or unsound practice" was one that posed a "reasonably foreseeable" "undue risk to the institution." 104 F.3d at 421. Other courts seem to have agreed, using slightly different language. The Third Circuit in *In re Seidman,* 37 F.3d 911 (3d Cir.1994), for example, said that an "imprudent act ... pos[ing] an abnormal risk to the financial stability of the banking institution" would qualify. *Id.* at 928. We trust that "undue" risks are abnormal in the banking industry, so we see no difference there. Plunging ahead with such a risk where its character is "reasonably foreseeable" surely constitutes the imprudence of which the Third Circuit speaks.

The acts attributable to Landry meet both parts of the test. The ALJ's and the Board's findings leave no doubt as to their imprudence. After a thorough review of the transactions we summarized above, the Board correctly concluded: "The list of misguided and aborted projects and relationships that management entered into with minimal information and virtually no expertise is shocking." That these activities exposed the Bank to abnormal risk is also unassailable. Conduct attributable to Landry included substantial involvement in at least one large loan to an uncreditworthy out-of-territory borrower, long-term contracts with consultants whose fees were "proportionately greater than the services rendered," and the use of Bank funds for travel and related expenses in pursuit of breathtakingly irresponsible schemes. In the Bank's weakened condition, these expenditures created an undue and abnormal risk of insolvency. As the FDIC Board found:

> [R]ather than preserve the Bank's few remaining assets, Landry chose to dissipate them in furtherance of his personal takeover of the Bank.
>
> ... [Landry] failed to disclose that Bank funds were being spent in furtherance of Pangaea and IAIS [a partnership intended to be used for the immigration law scheme]. He failed to disclose the contracts and certain uncreditworthy loans to which he or Jenson had committed the Bank, or the fee-splitting arrangements, which benefited him and Pangaea to the Bank's detriment.

Order at 26, J.A. at 243.

◼ Landry argues that the continuing profitability of the Bank during the relevant period forecloses a finding of undue risk, but in so arguing he misconstrues the concept of risk, which is independent of the outcome in a particular case. Just as a loss, without more, does not prove that an act posed an abnormal risk, see *Johnson v. OTS,* 81 F.3d 195, 204 (D.C.Cir.1996), a profit does not establish its absence.

■ *Effects.* The Board found that Landry's misdeeds had the forbidden effects, see Order at 29–30, J.A. at 246–47, because they caused both financial loss to the Bank, see 18 U.S.C. § 1818(e)(1)(B)(i), and personal financial gain for Landry, see *id.* § 1818(e)(1)(B)(iii). The losses consisted of $278,000 in expenses paid by the Bank in promoting Pangaea, and $174,900 in loan write-offs. Order at 29, J.A. at 246. (Although relatively small in relation to large-scale banking transactions, these expenses constitute over 12% of the amount ultimately used to recapitalize the bank.) Landry argues that none of the loans that yielded losses are properly attributed to him, but his method is simply to show that most of the misconduct at issue consisted of actions more directly attributable to his co-incorporators. Section 1818(e) authorizes punishment for actions taken "directly or indirectly." So long as the misconduct at issue meets the stringent preconditions for a removal order it doesn't matter that Landry engaged in many of the proscribed acts only indirectly, though knowingly, and certainly not that others may have been more guilty.

Landry also argues that his expenses cannot be considered losses because they were approved by the appropriate Bank officers and the Bank's shareholders. But these approvals were tainted, even assuming they could otherwise salvage the expenses. Landry's own letters show that he understood that his expenses and those of his co-incorporators were incurred on behalf of Pangaea to the detriment of the Bank, without the shareholders' having understood the fact.

■ *Culpability.* The Board found that Landry's misconduct doubly satisfied the culpability prong because it involved both personal dishonesty, see 12 U.S.C. § 1818(e)(1)(C)(i), and willful or continuing disregard for the safety or soundness of the Bank, see *id.* § 1818(e)(1)(C)(ii). The courts of appeals that have examined the question are in agreement that both standards of culpability require some showing of scienter. See *Kim v. OTS*, 40 F.3d 1050, 1054–55 (9th Cir.1994) (collecting cases). We have no trouble upholding the finding of personal dishonesty. In his letters and deposition testimony Landry repeatedly admitted that he solicited money for Pangaea in the guise of seeking capital for the Bank. See Order at 31–32, J.A. at 248–49. Knowing participation in a scheme that used the Bank's funds for personal gain while representing the scheme as the Bank's own, above-board plan to recapitalize itself qualifies as personal dishonesty. See *Greenberg v. Board of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 171 (2d Cir.1992) (finding that failure to disclose insider transactions provided ample support for a finding of personal dishonesty); *Van Dyke v. Board of Governors of the Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir.1989) (accepting the Board's definition of personal dishonesty which included "deliberate deception by pretense and stealth" and "want of fairness and [straightforwardness]" (alteration in original)).

■ Landry offers two arguments against this finding. First, he claims that a requirement that a bank control transaction must secure approval by the bank's directors and by regulators "provide[s] the ultimate assurance of fairness that precludes a sanction against Landry," citing *Kaplan*, 104 F.3d at 424. In *Kaplan*, however, we said only that when a director cast a vote in favor of an arguably risky transaction, his anticipation of the need for board and regulatory approval afforded "reasonable assurance that an unfair transaction would not take place." *Id.* There the vote was completely independent of a *later* scheme by *others* to circumvent the OTS's and the S&L board's approval processes. *Id.* at 422. Here, Landry and his co-incorporators' conduct, when viewed ex ante, was far from blameless. Instead, it accomplished the step missing in *Kaplan* by disguising wrongdoing from the regulators and the Bank's board of directors and directly misleading both.

■ Second, Landry argues, once again, that the Bank's approval of his expenses, and the failure of its board of directors and the FDIC to seek to remove him after fully initially examining the transactions at issue here, proves that he did not act dishonestly. But neither the independent audits commissioned by the Bank after the recapitalization, nor Landry's cooperation with the 1993 examination, eliminate his prior involvement as a co-incorporator and participant in the scheme. His later honesty, forthrightness, and integrity are to be commended, and his continued employment at the Bank shows that its management found that his role in the Pangaea scheme was outweighed by the benefits he offered the Bank. But we do not have the power to substitute our judgment—or the Bank's management's—for that of the FDIC. Once we conclude that Landry's conduct satisfies the statutory preconditions, we must uphold its decision.

■ Landry also argues that the FDIC reached its decision without taking account of exculpatory evidence. It is well established that the substantial evidence rule requires consideration of the evidence on *both* sides; evidence that is substantial viewed in isolation may become insubstantial when contradictory evidence is taken into account. See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Johnson v. OTS*, 81 F.3d 195, 204 (D.C.Cir.1996). But here the evidence to which Landry points is not exculpatory; it shows no more than that Landry had a lesser role than others in the individual actions taken in furtherance of the illegal scheme and that many of his actions were approved by the Bank. The FDIC Board did consider these factors, however, and its findings on all relevant facts are adequately supported by record evidence, including Landry's own statements.

■ Last, Landry says that the Board failed to provide adequate record citations for its factual findings. Indeed, Landry is correct that several critical findings lack record citation. Such omissions might render an agency's reasoning incomprehensible, possibly requiring a remand. See generally *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable."). But here the FDIC Board explicitly adopted the ALJ's findings of fact which, in turn, contained ample record citations for the factual findings that Landry disputes.

\* \* \* \* \* \*

For the foregoing reasons, Landry's petition for review is

*Denied.*

RANDOLPH, Circuit Judge, concurring in part and concurring in the judgment:

I join the court's opinion except for its disposition of Landry's claim under the Appointments Clause of the Constitution. In my view, *Freytag v. Commissioner*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), cannot be distinguished. The Administrative Law Judge who presided over Landry's case was as much an "inferior Officer" under Article II, § 2, cl. 2 of the Constitution as the special trial judge in *Freytag*. I nevertheless would sustain the FDIC's decision and order because Landry suffered no prejudicial error.

Rather than paraphrase the critical portion of *Freytag*, I will quote it in full:

Petitioners argue that a special trial judge is an "inferior Office[r]" of the United States. . . .

The Commissioner, in contrast to petitioners, argues that a special trial judge . . . acts only as an aide to the Tax Court judge responsible for deciding the case. The special trial judge, as the Commissioner characterizes his work, does no more than assist the Tax Court judge in taking the evidence and preparing the proposed findings and opinion. Thus, the Commissioner concludes, special trial judges . . . are employees rather than "Officers of the United States."

"[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II]." *Buckley* [*v. Valeo,* 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)]. The two courts that have addressed the issue have held that special trial judges are "inferior Officers." The Tax Court so concluded in *First Western Govt. Securities, Inc. v. Commissioner,* 94 T.C. 549, 557–559, 1990 WL 39357 (1990), and the Court of Appeals for the Second Circuit in *Samuels, Kramer & Co. v. Commissioner,* 930 F.2d 975, 985 (1991), agreed. Both courts considered the degree of authority exercised by the special trial judges to be so "significant" that it was inconsistent with the classifications of "lesser functionaries" or employees. Cf. *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 352–353, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (United States commissioners are inferior officers). We agree with the Tax Court and the Second Circuit that a special trial judge is an "inferior Office[r]" whose appointment must conform to the Appointments Clause.

The Commissioner reasons that special trial judges may be deemed employees in subsection (b)(4) cases because they lack authority to enter a final decision. But this argument ignores the significance of the duties and discretion that special trial judges possess. The office of special trial judge is "established by Law," Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute. *See Burnap v. United States,* 252 U.S. 512, 516–517, 40 S.Ct. 374, 64 L.Ed. 692 (1920); *United States v. Germaine,* 99 U.S. 508, 511–512, 25 L.Ed. 482 (1879). These characteristics distinguish special trial judges from special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute. Furthermore, special trial judges perform more than ministerial tasks. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the special trial judges exercise significant discretion.

Even if the duties of special trial judges [just described] were not as significant as we and the two courts have found them to be, our conclusion would be unchanged [because they may be assigned to conduct other types of proceedings and render independent judgments].... Special trial judges are not inferior officers for purposes of some of their duties ... but mere employees with respect to other responsibilities.

501 U.S. at 880–82, 111 S.Ct. 2631.

There are no relevant differences between the ALJ in this case and the special trial judge in *Freytag.* Both held offices "established by Law," Art. II, § 2, cl. 2; 501 U.S. at 881, 111 S.Ct. 2631. In both instances, "the duties, salary, and means of appointment for that office are specified by statute." *Id.*; *see* maj. op. at 1134. Both "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." 501 U.S. at 881–82, 111 S.Ct. 2631; *Samuels,* 930 F.2d at 986; *see* 12 C.F.R. § 308.5 (defining the ALJ's duties). "In the course of carrying out these important functions," both the special trial judge in *Freytag* and the ALJ in this case "exercise significant discretion." 501 U.S. at 882, 111 S.Ct. 2631.

The majority attempts to distinguish *Freytag* on two grounds. Neither survives close attention. First, the majority says that the Tax Court, in reviewing the special trial judge's "non-final decision" in *Freytag,* gave deference to factual and credibility findings pursuant to Tax Court Rule 183(c), whereas the FDIC reviewed the ALJ's decision *de novo.* Maj. op. at 1133. It would be odd for the constitution-

al status of a special trial judge to depend on an internal rule of procedure, particularly since the Tax Court had discretion to pick whatever standard of review it saw fit. *See* 26 U.S.C. § 7443A(c). Odd or not, the Supreme Court in *Freytag* decided that Tax Court Rule 183 and its deferential standard were "not relevant to our grant of certiorari"—and the Court granted the writ, so it explained, in order "to resolve the important questions the litigation raises about the Constitution's structural separation of powers." 501 U.S. at 874 n. 3, 873, 111 S.Ct. 2631.[1] The majority's first distinction of *Freytag* is thus no distinction at all. The fact that an ALJ cannot render a final decision and is subject to the ultimate supervision of the FDIC shows only that the ALJ shares the common characteristic of an "inferior Officer." "[W]e think it evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States,* 520 U.S. 651, 663, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997).

According to the majority opinion, the second difference between this case and *Freytag* is that here the ALJ can never render final decisions of the FDIC, whereas special trial judges could, in cases other than the sort involved in *Freytag,* render a final decision of the Tax Court. *See* maj. op. at 1133, 1134. It is true that the Supreme Court relied on this consideration; the last paragraph of the opinion quoted above indicates as much. What the majority neglects to mention is that the Court clearly designated this as an alternative holding. The Court introduced its alternative holding thus: "Even if the duties of special trial judges [just described] were not as significant as we and the two courts have found them to be, our *conclusion* would be unchanged." 501 U.S. at 882, 111 S.Ct. 2631 (italics added). What "conclusion" did the Court have in mind? The conclusion it had reached in the preceding paragraphs—namely, that although special trial judges may not render final decisions, they are nevertheless inferior officers of the United States within the meaning of Article II, § 2, cl. 2. The same conclusion, the same holding, had also been rendered in *Samuels, Kramer & Co. v. Commissioner,* 930 F.2d 975, 986 (2d Cir.1991), a decision the Supreme Court cited and expressly approved. *See* 501 U.S. at 881, 111 S.Ct. 2631. There the Second Circuit held that a special trial judge performing the same advisory function as the judge in *Freytag* was an inferior officer; the court of appeals did not mention the fact that in other types of cases, the judge could issue final judgments.[2]

1. There was doubt, despite this court's decision in *Stone v. Commissioner,* 865 F.2d 342, 344–47 (D.C.Cir.1989), whether the Tax Court had authority to provide by rule that it would give deference to special trial judge decisions rendered after an assignment pursuant to 26 U.S.C. § 7443A(b)(4). The Tax Court derived its rulemaking authority from § 7443A(c), but on its face that provision applied only to assignments under (b)(1) through (b)(3). Hence, the petitioners in *Freytag* argued that "Congress did not intend for Tax Court supervision of special trial judge findings and opinions in (b)(4) cases to be appellate in nature." Brief for Petitioners, 1991 WL 521270, at *22, *Freytag v. Commissioner,* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (No. 90–762). The Supreme Court avoided deciding the issue by deeming Rule 183 irrelevant to its disposition.

2. The Second Circuit reached this conclusion for the same reasons given in the third full paragraph of *Freytag* quoted in the text:

    The special trial judges are more than mere aids to the judges of the Tax Court. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. Contrary to the contentions of the Commissioner, the degree of authority exercised by special trial judges is "significant." *See Buckley* [*v. Valeo,* 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)]. They exercise a great deal of discretion and perform important functions, characteristics that we find to be inconsistent with the classifications of "lesser functionary" or mere employee. *Cf. Go–Bart Importing Co. v. United States,* 282 U.S. 344, 352, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (United States commissioners are inferior officers).

That the ALJ in this case is an inferior officer thus follows from *Freytag*. It follows also from the Supreme Court's recognition that the role of the modern administrative law judge "is 'functionally comparable' to that of a judge.... He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make *or* recommend decisions. See [5 U.S.C.] § 556(c)." *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (emphasis added). Furthermore, the ALJ, in proposing findings of fact and a recommended decision, which the FDIC reviewed *de novo*,[3] performed functions essentially like those of a federal magistrate assigned to conduct a hearing and to submit proposed findings and recommendations to a district judge. *See* 28 U.S.C. § 636(b)(1)(B). When there is an objection to a magistrate's findings and recommendations, the district judge—like the FDIC—must conduct *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C). Nonetheless, it has long been settled that federal magistrates are "inferior Officers" under Article II, which is why they are appointed by "Courts of Law" under 28 U.S.C. § 631. *See Rice v. Ames*, 180 U.S. 371, 378, 21 S.Ct. 406, 45 L.Ed. 577 (1901); *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 352–54, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *Pacemaker Diagnostic Clinic v. Instromedix*, 725 F.2d 537, 545 (9th Cir.1984) (en banc).

Because the ALJ in this case was an "inferior Officer," the next question would ordinarily be whether he was duly appointed by the President, a Court of Law, or the Head of a Department, as Article II requires. The FDIC assumed that the ALJ was an inferior officer and ruled that

he was properly appointed, having been hired by the Office of Thrift Supervision and assigned to this case by the Office of Financial Institution Adjudication. *See In re Landry*, FDIC–95–65e, 1999 WL 440608, at *28 & n. 37 (FDIC May 25, 1999). In this court, the FDIC has given up on this claim. For reasons it did not explain, it expressly abandoned the argument that the ALJ was appointed by the head of a department. *See* Brief for Respondent at 48 n.32. I accept that as a waiver of the defense. It is true that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief might be appropriate if a violation indeed occurred." *Ryder v. United States*, 515 U.S. 177, 182–83, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995). But I do not take this salutary rule to mean that a court may not accept a concession from the party defending the appointment.

The remaining question then is what relief is appropriate. Given the FDIC's *de novo* review and the majority's thorough rejection of Landry's various claims of error,[4] I am persuaded that he suffered no prejudice. The Administrative Procedure Act contains a harmless error rule. *See* 5 U.S.C. § 706; *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 212 (D.C.Cir.1998). The majority suggests that harmless error cannot apply because the constitutional violation is "structural" in nature. But as the majority acknowledges, in none of the "structural" cases it cites was there *de novo* review. *See* maj. op. at 1131–32. Still, the

930 F.2d at 986.

3. *De novo* review does not mean that the ALJ's recommended decisions are without influence. In this case the FDIC "affirm[ed] the recommendation of the ALJ and adopt[ed] his Recommended Decision, Findings of Fact and Conclusions of Law, as discussed herein." *In re Landry*, FDIC–95–65e, 1999 WL 440608, at *4 (FDIC May 25, 1999).

4. On some points, the FDIC supplied different rationales to reach the same conclusions as the ALJ and on other matters the FDIC reached different conclusions. *See, e.g., In re Landry*, 1999 WL 440608, at *33 (ordering release of certain documents withheld by the ALJ under the due process privilege). In the end, the conclusive evidence came from Landry himself. *See, e.g., id.* at *13–14 (reproducing portions of Landry's resignation letter to the bank).

**1144**

majority reasons that "[i]f the process of final de novo review could cleanse the violation of its harmful impact, then all such arrangements could escape judicial review." *Id.* at 1132. The majority is not correct about this. The rule in *Ryder*, quoted in the preceding paragraph, requires us to decide the Appointments Clause claim first, before we reach the question of relief. If we had done so correctly here, our decision would have been, in effect, a declaratory judgment that an ALJ sitting on a case such as this had to be appointed by the head of a department. Such a judgment would have been the "practical equivalent" of mandamus, as we said in *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 208 n. 8 (D.C.Cir. 1985). If any litigant in the future wished to challenge the ALJ's status before trial, mandamus would lie. Or a litigant could refuse to present evidence before an unconstitutional officer, or refuse to comply with an ALJ's discovery orders, and bring the case here for review after the FDIC acted. *See Morrison v. Olson*, 487 U.S. 654, 668, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Then there would be real prejudice. Here there is none and I therefore join in the denial of Landry's petition for judicial review.