The **FIRST NATIONAL BANK OF GORDON,** Gordon, Nebraska, a national banking association, **Petitioner,**

v.

**DEPARTMENT OF the TREASURY, OFFICE OF THE COMPTROLLER OF THE CURRENCY, Respondent.**

**No. 89–2246.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1990.

Decided Aug. 6, 1990.

---

an untrue report of condition, in violation of 12 U.S.C. § 161(a); and (3) it had committed unsafe and unsound banking practices, resulting in a level of "classified loans" in excess of 260% of its gross capital. The cease-and-desist order issued by the Comptroller purported to be effective immediately, and contained, among other things, a direction to the bank that it not extend any further credit to borrowers whose outstanding loans had been criticized by the Comptroller, unless failure to extend such credit "would be substantially detrimental to the best interests of the bank. . . ."

With respect to the alleged lending-limit violation, the bank contends that it proved that its loans to the Tribe, though they did exceed in amount 15% of the bank's unimpaired capital and surplus, were within at least one exemption to the statutory prohibition established by regulation of the Comptroller. In the alternative, the bank argues that the procedure followed by the Comptroller's office in deciding that this statute had been violated was so unfair as to deprive it of due process of law in violation of the Fifth Amendment. The bank also argues that 12 U.S.C. § 161(a)—having to do with reports of condition—was not violated, because its officers and directors who signed the reports of condition in question reasonably believed that they were accurate. Further, the bank contests the finding that it was guilty of any unsafe and unsound banking practice, arguing that the large number of questioned loans on its books were due not to any of its own practices, but rather to a generalized economic downturn in the area. Finally, the provisions of the cease-and-desist order itself are contested: the bank argues that the order cannot be made effective sooner than 30 days after its issuance,[1] and that

I. Thomas Bieging, Englewood, Colo., for petitioner.

Jonathan E. Taylor, L. Robert Griffin, Rolph E. Sharpe, Larry J. Stein, Joseph F. Colantuno, Washington, D.C., for respondent.

Before ARNOLD and BOWMAN, Circuit Judges, and HUNTER,* Senior District Judge.

ARNOLD, Circuit Judge.

This appeal comes to us from a cease-and-desist order issued by the Comptroller of the Currency against the First National Bank of Gordon in Gordon, Nebraska, a national banking association. The Comptroller found that the bank was in violation of law in several respects: (1) it had made loans to a single borrower, the ₍Oglala Sioux Tribe, in excess of the loan limit contained in 12 U.S.C. § 84; (2) it had filed

---

* The Hon. Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. The Comptroller now concedes that it was error to purport to make the order effective immediately. Under 12 U.S.C. § 1818(b)(2), "[a] cease-and-desist order shall become effective at the expiration of thirty days after the service of such order upon the depository insti-

tution. . . ." On remand, we direct the Comptroller to modify the order in accordance with this concession. No proceedings may be undertaken against the bank in connection with any alleged violations of the order during the first 30 days of its existence.

the provision prohibiting further extensions of credit to certain borrowers in the absence of special conditions was an abuse of discretion.

We affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.

I.

■ We address first the issues under 12 U.S.C. § 84. This statute provides in pertinent part as follows:

**(a) Total loans and extensions of credit**

(1) The total loans and extensions of credit by a national banking association to a person outstanding at one time and not fully secured, as determined in a manner consistent with paragraph (2) of this subsection, by collateral having a market value at least equal to the amount of the loan or extension of credit shall not exceed 15 per centum of the unimpaired capital and unimpaired surplus of the association.

As noted above, the borrower in question is the Oglala Sioux Tribe, which had been a good customer of the bank for some years. Absent any applicable exceptions, this bank's lending limit under the statute was stipulated to be $670,690. Total loans to the Tribe, however, amounted to $1,205,126, in excess of the lending limit by $534,436. Whether the statute was violated depends upon the applicability of certain exceptions established by regulation.

One of these exceptions appears in 12 C.F.R. § 32.5(d) (1989). This regulation has to do with loans to "foreign governments, their agencies, and instrumentalities." It provides, in essence, that loans to agencies or instrumentalities of foreign governments will be accounted for, so to speak, separately from loans to those governments themselves if they meet both of the following tests at the time the loan is made:

(i) the borrower has resources or revenue of its own sufficient over time to service its debt obligations ([the] "means" test); [and]

(ii) the purpose of the loan or extension of credit is consistent with the borrower's general business ([the] "purpose" test).

12 C.F.R. § 32.5(d). The regulation further provides, 12 C.F.R. § 32.5(d)(2), that "[i]n order to show that the 'means' and 'purpose' tests have been satisfied, a bank shall, at a minimum, assemble and retain in its files" certain listed documents. Here, it is agreed that this documentation requirement has not been satisfied. Accordingly, the bank, which has the burden of proof of establishing its entitlement to an exception from the statutory requirement, has not succeeded in showing that it is entitled to the "means and purpose" exception.

■ The bank also contends, however, and has argued all along, that it is entitled to the exception contained in 12 C.F.R. § 32.109 (1989), having to do with loans to "a State or political subdivision." This regulation reads as follows:

**§ 32.109 Loans to or guaranteed by general obligations of a State or political subdivision.**

(a) A loan or extension of credit to a bank customer which is guaranteed or fully secured by a "general obligation" of any State or political subdivision thereof, within the meaning of 12 CFR 1.3(g), is not considered an obligation of the customer for purposes of 12 U.S.C. 84. The lending bank should obtain the opinion of competent counsel that the guarantee or collateral is a valid and enforceable obligation of the public body.

(b) A loan or extension of credit to a State or political subdivision thereof is not subject to any limitation based on capital or surplus if the loan or extension of credit constitutes a "general obligation" of the State or political subdivision within the meaning of 12 CFR 1.3(g). The lending bank should obtain the opinion of competent counsel that the loan or extension of credit is a valid and enforceable obligation of the borrower.

At the hearing before the administrative law judge, the Comptroller contended that this exception was not applicable on two grounds: (a) that the Tribe was not analogous to a state or political subdivision; and

(b) that, even if it were, it did not possess the necessary powers of property taxation as required by 12 CFR § 1.3(g). That portion of the regulations defines the phrase "general obligation of any State or any political subdivision thereof" as "an obligation supported by the full faith and credit of an obligor possessing general powers of taxation, including property taxation." At this stage of the proceedings, the Comptroller did not suggest that the full-faith-and-credit requirement had not been met. The ALJ held in favor of the bank that the § 32.109 exception applied.

Then, for the first time, the Comptroller's office took the position, in its exceptions to the ALJ's recommended decision, that the § 32.109 exception did not apply because the full faith and credit of the Tribe had not been pledged in support of the questioned loans. Apparently, the Comptroller decided to abandon the position consistently taken by his office in the past that Indian tribes simply cannot qualify as states or political subdivisions for purposes of the regulation. He also abandoned the contention that the Tribe did not possess the requisite powers of taxation, and that issue appears no longer to be in dispute. The Comptroller did insist, however, that the bank had not shown that the Tribe's full faith and credit had been pledged, and that the ALJ's recommendation applying the § 32.109 exception should be rejected for this reason. The bank immediately objected to what it characterized as the injection of a new issue. Full faith and credit, it argued, had been conceded all along, at least as a practical matter, and the Comptroller should not be allowed to contest it without giving the bank an opportunity to produce new evidence and make appropriate legal arguments. The bank moved to strike that portion of the Comptroller's exceptions which argued that the full-faith-and-credit requirement of § 32.109 had not been met. The Comptroller denied the motion to strike, but gave the bank ten days within which to supply new evidence or legal arguments.

The bank availed itself of this opportunity and submitted, among other things, the following documents: an affidavit of the Tribe's president that the obligations of the Tribe were intended to be supported by its full faith and credit, and an opinion from counsel for the Tribe that the loans in question were "general obligations." The Comptroller, in his final decision, held this evidence insufficient to establish the exception and rejected the ALJ's recommendation, holding instead that the § 32.109 exception did not apply. The Comptroller took the position that the bank's showing on the full-faith-and-credit issue was lacking because it failed to address the following issues of fact, among others:

Whether the tribal treasurer was authorized to commit the full faith and credit of the Tribe to support the loans.

Whether the tribal president was authorized to commit the full faith and credit of the Tribe to support the loans.

Whether any tribal legislative act had pledged the Tribe's full faith and credit.

Whether tribal members had authorized commitment of the Tribe's resources to support the bank loans.

The basis of counsel's opinion that the tribal loans were general obligations.

R. 123–27. Failing proof of these points, the Comptroller said, the bank had not met its burden, and the lending limit of 12 U.S.C. § 84 had been violated.

On appeal, the bank claims that in fact it did meet its burden, that the affidavit of the president of the Tribe to the effect that the loans were backed by the Tribe's full faith and credit should be sufficient. On the face of it, we find this argument appealing. Ordinarily, the president of an organization has general authority to act in its behalf. See U.C.C. § 3–307; Neb.Rev. Stat. § 3–307 (1980) (one who executes a negotiable instrument in a representative capacity is presumed to act with all necessary authority, and the burden to show lack of authority is on one who disputes the authority). Here, the tribal treasurer signed the notes, and the tribal president stated under oath that they do pledge the full faith and credit of the Tribe. If this case were being tried in a court of law, we would think that this proof would at least be sufficient to establish a prima facie case

on the issue of full faith and credit, shifting the burden of going forward with evidence to the other side, if it wished to rebut the case.

■ We hesitate, however, to reverse the Comptroller outright on this theory. We are dealing with an agency with presumed expertise, and one whose task of preserving public confidence in the financial institutions of this nation is vital to our economic future. The nature and extent of proof required to show entitlement to an exception created by regulation should be, at least in the first instance, for the Comptroller to decide. We do agree with the bank, however, that the procedure followed here left something to be desired. The bank had no way of knowing, at the level of the ALJ, that the question of full faith and credit was contested. To be sure, as the Comptroller argues, the bank has the burden of proof of establishing an exception to the statute, but the Comptroller had steadfastly taken the position, up until the filing of his exceptions in this case, that § 32.109 was simply inapplicable, in general, to Indian tribes. They could not be, in his view, a "State or political subdivision." Accordingly, there was no reason for anyone to think that the question of full faith and credit was important. Then, when the Comptroller's exceptions to the ALJ's recommended decision revealed that the issue in fact was important, the bank was given only ten days to address it.

Under some circumstances—for example, if only a question of law were raised—ten days might well be sufficient. In the present case, though, the Comptroller's final decision makes clear that in his view the issue contains many factual complexities. The kind of detailed documentation that the Comptroller has chosen to require could not, in our view, reasonably be gathered within ten days. The bank therefore did not have a full and fair opportunity to litigate this issue. The procedure used was fundamentally unfair, and due process demands that the proceeding be reopened so as to give the bank a reasonable time within which to produce proof to satisfy the Comptroller's requirements.

Therefore, that portion of the cease-and-desist order under review which relates to 12 U.S.C. § 84 will be vacated, and this cause will be remanded to the Comptroller for further proceedings consistent with this opinion. On remand, the Comptroller is to give the bank a reasonable time, no less than 30 days after the case returns to the Comptroller's office, within which to produce proof to meet the detailed factual requirements that the Comptroller now asserts. Opposing counsel, of course, must be given a reasonable opportunity to rebut whatever proof the bank comes up with. The Comptroller should then proceed to decide the issue and enter whatever order is appropriate, subject to the right of any party aggrieved to seek further appellate review.

## II.

■ The second question raised by the appeal relates to 12 U.S.C. § 161(a). This statute provides as follows:

**(a) Reports of condition; forms; contents; date of making; publication**

Every association shall make reports of condition to the Comptroller of the Currency in accordance with the Federal Deposit Insurance Act [12 U.S.C. § 1811 et seq.]. The Comptroller of the Currency may call for additional reports of condition, in such form and containing such information as he may prescribe, on dates to be fixed by him, and may call for special reports from any particular association whenever in his judgment the same are necessary for his use in the performance of his supervisory duties. Each report of condition shall contain a declaration by the president, a vice president, the cashier, or by any other officer designated by the board of directors of the bank to make such declaration, that the report is true and correct to the best of his knowledge and belief. The correctness of the report of condition shall be attested by the signatures of at least three of the directors of the bank other than the officer making such declaration, with the declaration that the report has been examined by them and to the best

of their knowledge and belief is true and correct. Each report shall exhibit in detail and under appropriate heads the resources and liabilities of the association at the close of business on any past day specified by the Comptroller, and shall be transmitted to the Comptroller within ten days after the receipt of a request therefor from him; and the statement of resources and liabilities in the same form in which it is made to the Comptroller shall be published in a newspaper published in the place where such association is established, or if there is no newspaper in the place, then in the one published nearest thereto in the same county, at the expense of the association, and such proof of publication shall be furnished as may be required by the Comptroller. Special reports called for by the Comptroller need contain only such information as is specified by the Comptroller in his request therefor, and publication of such reports need be made only if directed by the Comptroller.

The issues framed by the parties with respect to this provision can be simply stated. The portion of the report of condition at issue is called the Allowance for Loan and Lease Losses. This allowance, essentially a reserve for bad debts, was, in the Comptroller's view, understated, thus making the financial condition of the bank appear better than it really was. The bank does not now contend that the allowance was correctly stated in its report of condition. It concedes that the allowance should have been larger. The bank argues, however, that the report of condition was "true and correct to the best of [the] knowledge and belief" of the bank officials who signed it. In the bank's view, this is all that the statute requires. It is not a strict-liability provision.

In response, the Comptroller draws a distinction between the duties of the bank itself under the statute, and the duties of the officers or directors who sign the report of condition. The Comptroller concedes that a bank official signing a report of condition does not violate the law, and cannot be subjected to any civil penalties or other liability, if the report is true and correct to the best of his knowledge and belief, at least where that knowledge and belief are reasonable. The bank itself, though, in the Comptroller's view, is obligated to file an accurate report, and can be subjected to a cease-and-desist order if it fails to do so, regardless of the state of mind of the officers signing the report. Although the question is a close one, in this instance we defer to the Comptroller's interpretation of a statute which he is charged with carrying out. It is a reasonable interpretation, though perhaps not the one we would adopt in the first instance.

Essentially, two sentences of § 161(a) are important here: the first sentence, which requires banks to make reports of condition, and the third sentence, which states that each report of condition shall contain a declaration by the person signing it that it is true and correct to the best of his or her knowledge and belief. Each of these sentences must be given effect, and the first sentence, we believe, should be read to require that reports of condition be accurate, not simply that they be non-negligent. This reading of the statute is consistent with a number of older director-liability cases, stemming from *Yates v. Jones National Bank*, 206 U.S. 158, 176–77, 27 S.Ct. 638, 644, 51 L.Ed. 1002 (1907). There, the Supreme Court said:

> Although the statutory provisions ... do not ... expressly require that the [call] report when made should contain a "true" statement of the condition of the association, yet, by necessary implication, such is the character of the statement required to be made, and by the like implication the making and publishing of a false call report is prohibited.

See also *Chesbrough v. Woodworth*, 244 U.S. 72, 37 S.Ct. 579, 61 L.Ed. 1000 (1917); *Thomas v. Taylor*, 224 U.S. 73, 32 S.Ct. 403, 56 L.Ed. 673 (1912); *Harmsen v. Smith*, 542 F.2d 496 (9th Cir.1976). Though these decisions are not dispositive on the bank's liability—which the Comptroller admits is a novel question of statutory interpretation—their general language about this statute, and its predecessors,

provides useful landmarks for that interpretive task.

The Comptroller does not here contest the bank's assertion that its officials who signed the call reports in question reasonably believed that they were accurate. The bank, on the other hand, does not contest the Comptroller's assertion that the call reports were in fact inaccurate, on account of understating the allowance for losses. At bottom this is a question of policy, and the Comptroller offers good reasons why his interpretation makes more regulatory sense than does the bank's alternative reading of this provision. In this situation, we accept as reasonable the Comptroller's interpretation of the statute—that the bank, by filing an inaccurate call report, has violated the law. *Chevron v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Accordingly, this portion of the cease-and-desist order will be affirmed.

We caution the Comptroller, however, that this does not mean that civil penalties, either against the bank or its officers, can be based on a violation of this cease-and-desist order. Certainly the officers, who behaved reasonably, are not exposed to such penalties. And even the bank itself, if a civil-penalty proceeding should be commenced against it, would have the argument that penalties should not be imposed in the absence of at least some negligence by one of its human agents. We express no view on the merits of this argument at this time: we mention it simply to alert the parties that the availability of a penal sanction for violation of a cease-and-desist order based upon the Comptroller's strict reading of § 161 is an open question.

### III.

Next, the bank contests the finding that it had committed unsafe and unsound banking practices. This finding, the bank contends, is based solely on the fact that it had accumulated a particular level of questioned loans. This condition, the bank says, is due not to any fault of its own, but rather to general economic conditions within its service area. This is of course a question of fact, and one peculiarly suited to the expert judgment of the Comptroller. There was evidence that a 261% "classified level" was excessive as compared with other banks in the same general area, R. 871, and the Comptroller found that this higher level of classified assets was "primarily attributable to the inadequate lending practices of the [b]ank." R. 48. The bank's gross capital as of April 1987 was $4,471,000, while the more than 100 loans that the Comptroller had classified totaled $11,659,624. The level of classified loans had increased in the course of the last four examinations from 139% to 260%, R. 885. Among the practices of the bank noted in the record are failure to obtain adequate credit and collateral information, failure to perform independent credit checks on purchased participations, and failure to identify problem loans.

Taking into account both the factual nature of the issue and the long experience of the Comptroller in dealing with it, we are not persuaded that an error was committed. The finding of unsafe practices and of a causal connection to the high level of classified loans is supported by substantial evidence on the record as a whole, and we affirm it.

### IV.

Last, the bank complains of a provision in the cease-and-desist order relating to future extensions of credit to borrowers whose loans had been questioned. The provision in question, article I, paragraph (4) of the order, reads as follows:

The Bank shall not extend credit, directly or indirectly, including renewals, extensions, or capitalization of accrued interest; to any borrower whose loans or other extensions of credit are criticized in the Report of Supervisory Activity and whose aggregate loans or other extensions of credit exceed one hundred thousand dollars ($100,000).

There is, however, an escape clause. This prohibition does not apply if certain conditions are met, including the following:

[T]he Bank's failure to extend further credit to a criticized borrower would be substantially detrimental to the best interests of the Bank; [and]

\* \* \* \* \* \*

prior to renewing, extending or capitalizing any additional credit, a majority of the full Board (or delegated committee thereof) approves the credit extension and certifies, in writing, the specific reasons why failure to so act would be substantially detrimental to the best interests of the Bank....

Article I, paragraph (5)(a), (c), R. 191–92.

 No doubt the language could have been more specific, but the nature of the subject matter to be addressed requires a certain level of generality, and we should be especially careful not to interfere with the Comptroller's discretion in the framing of remedies. We see no error of law or abuse of discretion in these provisions of the order. We take it as a given that a certification by the Board, or by a committee, as the case may be, stating the reasons why failing to extend further credit to a borrower in question would be substantially detrimental to the bank, if made in good faith and reasonably, would be a good defense against any proceeding for civil penalties for violation of the order. Penal provisions, even those involving civil penalties, should be strictly construed. This is not to say that Congress, if it wished, could not impose a penalty, or even a criminal sanction, without regard to the state of mind of the violator. But in the absence of a specific provision so stating, we are reluctant to interpret either an administrative order or a statute to provide for the imposition of penalties on a bank or a bank official who acts reasonably, even if, with the benefit of later hindsight, his actions are shown to have been in some sense erroneous.

## V.

To summarize: that portion of the cease-and-desist order which purported to make it effective immediately is vacated, and, on remand, the Comptroller is instructed to amend the order so that its effective date will be no sooner than 30 days after its issuance. In addition, that portion of the order that is based upon an alleged violation of the lending-limit provisions of 12 U.S.C. § 84 is vacated, and the cause remanded for further proceedings with respect to that issue in accordance with this opinion. In all other respects the cease-and-desist order is affirmed.

It is so ordered.