# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 3, 2018        Decided December 7, 2018

No. 17-1188

WILLIAM R. BLANTON,
PETITIONER

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,
RESPONDENT

---

On Petition for Review of an Order of the Final Decision
and Order of the Office of the Comptroller of the Currency

---

*Craig E. Bertschi*, *pro hac vice*, argued the cause for petitioner. On the briefs were *Mary C. Zinsner* and *Syed M. Reza*.

*Amber N. Melton*, Attorney, Office of the Comptroller of the Currency, argued the cause for respondent. With her on the brief were *Charles M. Steele*, Deputy Chief Counsel, and *Gregory F. Taylor*, *Douglas B. Jordan*, and *Daniel Prieve*, Attorneys.

Before: TATEL, SRINIVASAN and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Comptroller of the Currency assessed a $10,000 civil money penalty against William Blanton, the former Chief Executive Officer of a Georgia bank. The penalty was based on two distinct sets of allegations against Blanton. First, the Comptroller found that Blanton engaged in unfair and unsound banking practices by allowing the bank to honor repeated overdrafts in the accounts of a frequent customer. Second, the Comptroller determined that Blanton caused the bank to file materially inaccurate reports concerning the bank's financial condition.

Blanton seeks review of the Comptroller's decision. We uphold the Comptroller's determination concerning Blanton's involvement in honoring the overdrafts. But we set aside the Comptroller's decision with regard to the financial reports.

I.

United Americas Bank, chartered in the late 1990s, aimed to serve the growing Hispanic community in Atlanta, Georgia. In 2007, William Blanton acquired a shareholder interest in the Bank. He assumed a seat on the Bank's Board of Directors and served as the Bank's Vice Chairman.

In 2009 and 2010, the Bank underwent an examination by the Office of the Comptroller of the Currency (OCC), the federal agency tasked with supervising national banks. The OCC determined that the Bank was in "an unsafe and unsound condition" and that its management was "critically deficient." ALJ Decision, William R. Blanton, AA–EC–2015–24 (Office

of the Comptroller of the Currency Jan. 19, 2017) at 2, J.A. 137.

At Blanton's behest, the Board asked the Chief Executive Officer to resign, and the Board chose Blanton to serve as interim CEO during the search for a permanent replacement. The OCC authorized the arrangement, permitting Blanton to serve in the interim position until September 2010. At that time, the Board sought to retain Blanton as the permanent CEO, but Blanton neglected to submit the proper paperwork to secure the OCC's approval. In September 2010, he resigned as CEO and Vice Chairman, and, one month later, resigned from the Board. Despite efforts by the OCC and the Bank to revive its financial condition, the Bank closed its doors in December 2010 and went into receivership.

In June 2015, the OCC issued a Notice of Assessment of a civil money penalty against Blanton. The OCC can assess a civil money penalty of up to $25,000 per day if it determines, as relevant here, that a federal bank affiliate violated any law or regulation or recklessly engaged in an unsafe or unsound banking practice, and that the violation or practice is part of a pattern of misconduct. *See* 12 U.S.C. § 1818(i)(2)(B). In this case, the OCC's assessment arose from Blanton's involvement while interim CEO in two sets of bank transactions. The facts of each set of transactions were as follows.

A.

First, the OCC asserted that Blanton recklessly engaged in unsafe and unsound banking practices by allowing the Bank to honor several overdrafts in the accounts of a longstanding customer without adequate controls.

By the time Blanton became interim CEO, the Bank had developed a longstanding relationship with a local businessman, Alex Campos. Campos had over thirty personal and business accounts with the Bank. Over the years, Campos made numerous transfers that caused substantial overdrafts in some of his accounts, and the Bank always honored the overdrafts.

In 2003, the OCC became aware of the Bank's practices concerning Campos's overdrafts. At the time, Campos had incurred a $5.4 million overdraft at the Bank. The OCC decided against taking action after Campos corrected the 2003 overdrafts and paid attorney's fees to the Bank.

The Bank then implemented two controls designed to mitigate the risk caused by the Campos overdrafts. First, the Bank decided to honor overdrafts only in amounts less than the total funds available in Campos's accounts. Second, the Bank instituted a practice of transferring funds between Campos's accounts (with his permission) to cover overdrafts.

The overdrafts nonetheless continued through 2010. Between June and October 2010, for instance, there were at least thirty instances in which one of Campos's accounts was overdrawn by more than $50,000. At times, the overdrafts in his accounts reached amounts exceeding 50% of the Bank's overall Tier 1 capital, *i.e.*, its most reliable aggregation of assets.

In early 2010, OCC examiners asked the Bank to place additional controls on the Campos overdrafts. Blanton assured the examiners that he would resolve the problem by expelling Campos's accounts from the Bank, by securing a formal contract enabling the Bank to transfer funds between his accounts at will, or by refusing to honor Campos's overdrafts

altogether. Although Blanton did not specify when he would take action, the OCC examiners expected that he would enact the controls "immediately," which they took to mean within thirty to sixty days. Lawrence Dep. 30, Mar. 2, 2016, J.A. 955. Blanton delegated the task of implementing the controls to the Bank's Chief Credit Officer, Robert Beal.

The Bank, though, continued to honor the Campos overdrafts, and Blanton continued to assure the OCC that he was taking steps to enact the promised controls. In April 2010, Blanton emailed the OCC, vowing that the Bank had the issue "close to resolution," although there were "still some parts left." Blanton Email to Lawrence, Apr. 30, 2010, J.A. 966. The next month, at a meeting with Blanton, OCC examiners provided him a draft report of examination discussing "the risks involved with allowing a customer to make large and frequent intra fund transfers that result in overdrafts." Final Decision, William R. Blanton, AA–EC–2015–24 (Office of the Comptroller of the Currency July 10, 2017) at 7, https://www.occ.gov/static/enforcement-actions/ea2017-064.pdf [hereinafter Final Decision]. In June 2010, the Bank's Chief Financial Officer, Charles Knight, notified Blanton that Campos continued to overdraw his accounts, but the Bank's position, according to a Bank employee, still was to "pay everything." *Id.* at 8. After sending Blanton a second draft report of examination warning against authorization of the Campos overdrafts, the OCC issued a final report stating that the Bank's practice was unsafe and unsound, posing an "unwarranted and excessive credit risk" to the Bank. OCC Report of Examination 35, Dec. 31, 2009, J.A. 420.

In August 2010, Blanton met with Campos to discuss the overdrafts, and they orally agreed to three additional controls: first, the overdrafts would be limited to ten percent of the total balance of Campos's accounts; second, the Bank would have a

written right to make transfers between his accounts to offset any overdrafts; and third, Campos and his companies would guarantee any overdrafts. None of the controls took effect, however, and Campos continued to overdraw his accounts. Ultimately, after Blanton's resignation and shortly before the Bank's failure, Beal notified Campos that the Bank would no longer honor overdrafts on his accounts.

B.

Second, the OCC alleged that Blanton had violated the National Bank Act by causing the Bank to file three materially inaccurate "call reports." Those reports describe a bank's financial condition and enable banking agencies to "monitor the condition, performance, and risk profile" of banks and the financial industry as a whole. 12 C.F.R. § 304.3(a); *see* 12 U.S.C. § 161(a). When preparing call reports, a bank must adhere to Generally Accepted Accounting Principles (GAAP) and "accurately reflect" the bank's capital. 12 U.S.C. § 1831n(a)(1)(A), (2)(A).

The OCC's allegations about the Bank's call reports stem from the Bank's valuation of loans issued to two property developers. In May 2006, the Bank loaned $2.1 million to Brooks Avenue for acquisition and rehabilitation of an apartment complex in Atlanta. In 2007 and 2008, the Bank made two loans totaling $2.2 million to AH&H Property for the purchase of land and construction of single-family homes in the city. All three loans were secured by the targeted property and guaranteed by each debtor-company's principal.

The properties securing the loans failed to develop as planned. The Bank attempted to salvage the loans by amending the companies' loan agreements. The companies, however, were unable to maintain adherence to the amended loan terms.

As a result, in 2009, the Bank downgraded the loans in its June, September, and December "Criticized Asset Reports," classifying the loans as "impaired" and "collateral dependent." Final Decision at 19. According to GAAP, classification of the loans as "impaired" meant that "it [was] probable" that the Bank would be "unable to collect all amounts due according to the contractual terms of the loan agreement." Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 114 ¶ 8 (1993). The classification of "collateral dependent" signaled that "repayment of the loan [was] expected to be provided solely by the underlying collateral," such as through a sale of the properties. *Id.* ¶ 13.

The Bank's Board, including Blanton as a member, approved the Criticized Asset Reports. With regard to the Brooks loan, the Bank reported that it downgraded the loan "due to the length of time it [took] to get the renovation project underway and the 25 year amortization on the loan." Final Decision at 19. As for the AH&H loan, the downgrade was "due to the length of time that the loan . . . ha[d] been with the bank without principal reduction." *Id.* at 18.

In February 2010, the OCC examined the Bank's Criticized Asset Reports and agreed with the classification of the loans as impaired and collateral dependent. The OCC directed the Bank to obtain new appraisals of the properties' values and instructed that the Bank would likely need to "write down" or "charge off" the loans, referring to the process of reducing the asset value of the loans. The appraisals, as expected, indicated that the market value of the two properties had significantly declined, representing only a small share of the loans' outstanding balances.

On May 19, 2010, Blanton sought and received the Board's approval to charge off the loans. The Bank reduced

the value of the Brooks loan by $1.5 million and the value of the AH&H loan by $1.1 million, for a total reduction of the Bank's capital by $2.6 million. The Bank amended and refiled its call reports from December 2009 and March 2010 to reflect the decision to charge off the loans.

Within a few days, Blanton decided to revisit the Bank's decision to charge off the loans, prompting a series of communications between the OCC and the Bank's officers. Because the OCC's determination against Blanton concerning the call reports turned in significant measure on those communications, we recount them here in some detail.

On May 23, 2010, Blanton emailed an OCC examiner, Walter Lawrence, stating that the Bank would be able to "restore much of the year end charge offs and bolster the capital of the bank" because the guarantors for both projects could pledge additional collateral to secure the loans. Blanton Email to Lawrence, May 23, 2010, J.A. 504. In response, Lawrence advised Blanton that his statement was "in error regarding rebooking charged-off credits." Lawrence-Blanton Email Exchange, May 24, 2010, J.A. 503. "The bank," Lawrence continued, "*can not* rebook a charged-off credit." *Id.* He also quoted the call-report instructions stating that, once a bank charges off a loan and "establishes a new cost basis for the asset," the "cost basis may not be 'written up' at a later date." *Id.* (quoting Call Report Instructions A-3, Dec. 2009, J.A. 828). Such a rebooking, Lawrence stated, was "not an acceptable accounting practice." *Id.* Blanton responded and acknowledged that his prior position was "incorrect." *Id.*

Following the exchange with Lawrence, however, Blanton further examined the history of the loans and concluded that they "probably shouldn't have been charged off at all." Blanton Dep. 203, Mar. 1, 2016, J.A. 614. In his view,

although the OCC had instructed the Bank to charge off the loans, "there wasn't any basis for that" decision because, according to "[his] recollection," the loan holders or guarantors for each loan "were paying." *Id.* at 162, J.A. 582. Blanton testified in the proceedings before the agency that, according to the brother of the Bank's Chairman, the AH&H guarantor was "good as gold" and had "substantial" financials. *Id.* at 165, J.A. 585. Additionally, Blanton testified, he knew the holder of the Brooks Avenue loan to have profitable financials. Based on that knowledge, Blanton concluded, it was "very unusual" to have charged off the loans. *Id.* Thus, in June 2010, Blanton announced at a Board meeting that the Bank would "take a second look at the application" of GAAP to the loan charge offs "mandated by the OCC," and that, "[f]rom this second look, the bank might recover[] $3MM." Bank Board Minutes 3, June 15, 2010, J.A. 869. Blanton also stated that the Bank's internal auditor "would be willing to write up a document supporting the [B]ank's assertions." *Id.*

Blanton turned to Knight (the CFO) and Salvator Inserra (the Bank's outside auditor) in search of advice about reversing the charge offs. Knight first asked Inserra for "a resource" to show the OCC "that supported the argument about what [Inserra had] said about the guarantor." Knight-Inserra Email Exchange, June 29, 2010, J.A. 1077. Inserra replied that GAAP does not address "where the [cash flow] can be sourced," but "states that all [cash flow] should be considered." *Id*. Knight forwarded the email exchange to Blanton. Knight next asked Inserra about a statement in the OCC Handbook that endorsed a bank's consideration of a guarantor's ability to support the debt as a factor relevant to loan classification. Inserra responded, "Gaap does not require a [write down]. That is a recent (last 18 mos) interpretation by the regs." Knight-Inserra Email Exchange, July 2, 2010, J.A. 453. Knight forwarded that email to Blanton, too, interpreting Inserra's

comment to mean "that GAAP [did] not require the write downs [the Bank] did [according to] interpretation by the regulators." *Id.*

The following week, Knight, on Blanton's instruction, reversed the charge offs and rebooked the loans. Knight then emailed Lawrence at the OCC (and Blanton via blind carbon copy) to inform Lawrence of the rebooking. Knight said, "we are revising the[] loans as not impaired due to additional collateral and cash flows from the guarantors. We will reserve for these loans instead, and the impairment will be reduced or eliminated." Knight Email to Lawrence, July 13, 2010, J.A. 891. In a separate correspondence, Knight told Inserra that "Walter [Lawrence] of the OCC mentioned that they would not usually allow for a charge-off to be reversed." Knight Dep. 265, Feb 18, 2016, J.A. 383. Indeed, Lawrence later emailed to say that, although Inserra and the Bank's internal auditor had a "different point of view[,] . . . it [was] imperative that the . . . call reports accurately reflect the required . . . amounts." Lawrence Email to Knight, July 26, 2010, J.A. 501.

Knight also exchanged a few emails with Inserra. In one, Knight relayed Blanton's request that Inserra "lend [his] weight to the write-up" supporting the Bank's decision to reverse the charge offs, specifically including "any suggestions[,] . . . sources [he could] come up with[,] [and] other examples to support the bank's . . . position." Knight-Inserra Email Exchange, July 13, 2010, J.A. 874. Inserra returned a rough draft of the write-up, requesting that Knight "fill in some of the details"—namely, "quantifiable data" that was "very important." *Id.*, J.A. 886. But Knight responded that they were unable to fill in the empty data fields at the time. *Id.* The missing information pertained to the values of the properties listed as collateral for the loans, which Inserra needed to show that the guarantors had pledged additional collateral and were

thus "willing to support the loan." Inserra Dep. 71, Mar. 17, 2016, J.A. 857. Inserra told Knight, though, that the goal was "to convince the OCC" that the loans should never have been charged off in the first instance. Inserra Email to Knight, July 15, 2010, J.A. 458. When asked about the Bank's reversal of the charge offs at a deposition, Inserra refused to confirm that the facts supported the propriety of the Bank's doing so: he testified that the information he had gathered "was not sufficient to argue that the charge-off that was taken was inappropriate." Inserra Dep. 240, Mar. 17, 2016, J.A. 865.

On August 16, 2010, the Bank filed amended call reports for the December 2009, March 2010, and July 2010 periods that reflected the decision to reverse the charge offs and rebook the loans. Two days later, an OCC examiner, Anne Marie Corathers, emailed Blanton to inquire about the basis for any changes in the amended call report. She wrote that "[t]he rebooking of a charged off asset is NOT permitted" and that "the Bank must recognize the total write downs directed by examiners." Corathers Email to Blanton, Aug. 18, 2010, J.A. 914. The Bank never provided the requested information.

Shortly after Blanton resigned from the CEO position, the Bank once again decided to charge off the loans. The Bank filed amended call reports reflecting that change.

C.

The OCC filed a motion for summary disposition on both the overdraft and call-report allegations. The OCC's regulations allow for issuing a decision on summary disposition if there is no genuine issue of material fact. *See* 12 C.F.R. § 19.29(a). Blanton contested the claims on the merits and also argued that the overdraft claim was barred by a five-year statute of limitation.

On January 19, 2017, the ALJ recommended granting summary disposition in favor of the OCC. The Comptroller adopted the recommendation over Blanton's objections and imposed a $10,000 civil money penalty covering both violations. Blanton now seeks our review.

II.

Blanton raises three challenges to the Comptroller's decision. He initially contends that the five-year statute of limitations established by 28 U.S.C. § 2462 barred the OCC's claim concerning the Campos overdrafts. On the merits, Blanton argues that the Comptroller erred in concluding that the Bank's repeated honoring of the Campos overdrafts constituted an unsafe or unsound banking practice and that Blanton's involvement in the practice was reckless. Blanton also contests the Comptroller's determination against him based on the Bank's submission of materially inaccurate call reports in violation of the National Bank Act.

The Administrative Procedure Act (APA) sets out the standards governing our review of the Comptroller's determination. *See* 12 U.S.C. § 1818(h)(2). Under the APA, we will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or is taken "without observance of procedure required by law," *id.* § 706(2)(D). Review of agency action under those APA standards is generally considered to be deferential. *E.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325-26 (D.C. Cir. 2017).

Here, the question before us is not merely whether to sustain the Comptroller's ultimate decision against Blanton, but whether to sustain the Comptroller's issuance of the decision via summary disposition. According to the OCC's

regulations, the Comptroller acts through summary disposition only if "[t]here is no genuine issue as to any material fact" and "[t]he moving party is entitled to a decision in its favor as a matter of law." 12 C.F.R. § 19.29(a). That standard parallels the summary-judgment standard set forth in Federal Rule of Civil Procedure 56. And we apply a de novo standard when reviewing a district court's grant of summary judgment under Rule 56. *E.g.*, *Nat'l Sec. Counselors v. U.S. Dep't of Justice*, 848 F.3d 467, 470 (D.C. Cir. 2017).

We see no reason our approach should be altogether different when reviewing an agency's issuance of a determination on summary disposition. That is, when an agency elects to proceed via summary disposition under its regulations but errs in concluding that there is no genuine issue as to any material fact—and thus errs in determining that a decision is warranted as a matter of law without any evidentiary hearing or findings—then the agency has acted in a manner "not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

Applying that approach here, we uphold the Comptroller's determination on summary disposition that Blanton recklessly engaged in an unsafe or unsound banking practice by authorizing the Bank to honor Campos's overdrafts. But as to the Comptroller's determination that Blanton caused the Bank to file materially inaccurate call reports, we cannot sustain the Comptroller's assessment that there was no genuine issue of material fact with regard to that issue. We thus vacate the Comptroller's decision concerning the call reports.

A.

Blanton first challenges the Comptroller's determination that he recklessly engaged in an unsafe or unsound bank

practice each time he authorized the Bank to honor an overdraft in Campos's accounts. We uphold the Board's determination.

1.

As a threshold matter, Blanton argues that the OCC's claim concerning Campos's overdrafts is barred by the statute of limitations set forth in 28 U.S.C. § 2462. Section 2462 provides that an action "for the enforcement of any civil . . . penalty . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." Here, OCC filed its original Notice of Assessment on June 30, 2015, meaning that any claims must have "accrued" on or after June 30, 2010.

A claim generally accrues "when the factual and legal prerequisites for filing suit are in place." *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000) (quoting *3M Co. (Minnesota Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1460 (D.C. Cir. 1994)). Here, an actionable infraction consists of two elements: first, the bank official must "recklessly engage[] in an unsafe or unsound [banking] practice"; and second, the reckless practice must be "part of a pattern of misconduct." 12 U.S.C. § 1818(i)(2)(B)(i)(II), (ii)(I). For our purposes, then, a claim accrues each time a bank official recklessly engages in an unsafe or unsound banking practice as part of a pattern of misconduct.

Blanton contends that the OCC's overdraft claim accrued long before June 30, 2010, because the Bank's practice of honoring Campos's overdrafts began before Blanton assumed the CEO role. But the initial onset of the Bank's ongoing (and preexisting) pattern of honoring the overdrafts did not alone trigger the limitations clock. Rather, each instance of an unsafe

or unsound practice triggers a new claim if part of a pattern of misconduct. *See Proffitt*, 200 F.2d at 863-64.

As a result, each time the Bank, under Blanton's direction, honored a Campos overdraft without having imposed adequate risk controls, an unsafe or unsound banking practice occurred, continuing the pattern of misconduct and causing a new claim to accrue. It follows that each honored overdraft after June 30, 2010 (there were at least ten) constituted an actionable banking practice as part of a pattern of misconduct. And even though the OCC "might well have brought an action earlier," its "failure to do so" does not make the claims it elected to bring "untimely." *Id.* at 864.

2.

Turning to the merits, Blanton first contests the Comptroller's determination that the Bank's practice of honoring the Campos overdrafts constituted an unsafe or unsound banking practice. A banking practice is unsafe or unsound if it poses a "reasonably foreseeable undue risk." *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1138 (D.C. Cir. 2000) (quotation marks omitted) (citation omitted). The Comptroller determined that the Bank's overdraft practice was unsafe and unsound because Blanton (and the Bank) had "failed to control the risk" of Campos's "continuous and large overdrafts." Final Decision at 13.

The record evidence supports the Comptroller's finding that the overdrafts in Campos's accounts were "continuous and large." *Id.* Between June 30, 2010, and August 27, 2010, at least ten overdrafts in one of Campos's accounts exceeded $100,000, with five overdrafts exceeding $200,000. At one point, four of Campos's accounts were overdrawn at once, to

the tune of $443,532 in total, amounting to nearly 65% of the Bank's Tier 1 capital.

Additionally, the Comptroller reasonably explained why the authorization of the frequent and large overdrafts, if inadequately controlled, posed a significant risk to the Bank's financial stability. Given the Bank's already perilous financial condition at the time—when Blanton assumed the CEO role, the Bank was suffering from "critically deficient capital"—the Comptroller determined that "it [was] likely that the Bank would have failed had Mr. Campos not covered the overdrafts." Final Decision at 14.

Blanton argues that the Comptroller incorrectly concluded that the overdrafts were risky because there was no evidence indicating that Campos could not honor them. In fact, Blanton stresses, the Bank never lost money on the Campos overdrafts.

The Comptroller, though, accurately explained that there is no requirement of an actual loss. Final Decision at 11-12. In determining whether a particular banking practice is unsafe or unsound, the relevant inquiry is whether the practice causes a *risk* of loss, regardless of any actual loss. *Id.* at 11. The Comptroller reasonably concluded that frequent and large overdrafts (often exceeding over half the amount of the Bank's core capital) carried a substantial risk that an overdraft would lead to Bank failure if Campos did not cover the difference. *See Landry*, 204 F.3d at 1138 (explaining that a bank's continuing profitability does not preclude a finding of undue risk).

Next, Blanton contends that the controls established by the Bank in 2003 sufficed to eliminate any material risks associated with honoring the Campos overdrafts. Those controls included transfers between Campos's accounts (with

his permission) and a practice of honoring only those overdrafts amounting to less than the total funds in all of Campos's accounts. Blanton points to the testimony of Richard Cheatham, the Bank's outside counsel, that those controls rendered the overdraft practice safe and sound. Cheatham also opined that more formal measures were unnecessary because the risk of criminal sanctions would have deterred Campos from overdrawing his account without coverage.

The Comptroller, though, reasonably explained that the controls were insufficient because their effectiveness significantly depended on Campos's willingness to abide by them. Final Decision at 10. And although Campos typically allowed the Bank to transfer money between his accounts, he was not bound to that arrangement. At any time, Campos could have withdrawn money from his accounts or refused to allow transfers between the accounts, leaving the Bank on the hook for the overdrafts—which, as discussed above, might have caused the Bank's failure. As for Cheatham's testimony, the Comptroller found it to be wholly unsupported by the record and lacking any basis in legal reasoning or precedent. *See id.* at 10 & n.77. Indeed, Cheatham's affidavit contains no citation to any source supporting his assertions. *See* Cheatham Aff., Oct. 17, 2016, J.A. 296-300. Even on summary disposition, the Comptroller did not err in finding that Cheatham's unreasoned and unsupported conclusions did not create a genuine factual issue. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 254-55 (1986).

Blanton also argues that the Comptroller overlooked evidence that banks frequently honor overdrafts for certain creditworthy customers. But the Comptroller did not broadly declare that a bank could never honor a customer's overdrafts. Rather, the Comptroller found that the overdrafts in this case, in the particular circumstances, posed an unacceptable risk.

Final Decision at 12. That determination, as explained, was reasonable and also was consistent with OCC precedent holding that the honoring of overdrafts can constitute an unsafe or unsound banking practice when the overdrafts compromise a bank's stability. *See Van Dyke v. Bd. of Governors*, 876 F.2d 1377, 1380 (8th Cir. 1989); *In re Welk*, No. FDIC-91-201e, 1992 WL 813217, at *10 (June 5, 1992).

Blanton, finally, suggests we should infer the soundness of the Bank's overdraft practice from the fact that the OCC instructed the Bank to cease honoring Campos's overdrafts only in 2010 even though it knew of the overdrafts as early as August 2003. We reject Blanton's invitation to assess the propriety of his conduct based on the OCC's enforcement timeline. Many factors unrelated to the merits of a case can influence when an agency decides the time is ripe for prosecution. *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). The Comptroller, in short, reasonably determined that the Bank's honoring of Campos's overdrafts constituted an unsafe or unsound practice.

3.

Blanton also challenges the Comptroller's determination that he recklessly disregarded the risks posed by the Campos overdrafts when he was CEO of the Bank. The Comptroller determined that Blanton acted recklessly because he was aware of the risk posed by the overdrafts from his interactions with the OCC but took only "perfunctory steps to mitigate the risk." Final Decision at 15.

There is no dispute that Blanton was made aware of the risks associated with honoring the Campos overdrafts. On several occasions, the OCC notified Blanton and other Bank officials of the dangers of the Bank's practice. Also, other

Bank employees alerted Blanton to the overdrafts and reminded him of the OCC's position that the overdrafts were unduly risky. All the while, Blanton vowed that he was working on implementing further controls. Yet he never instituted the additional controls or otherwise took action to curtail the Bank's practice.

Blanton points to steps he took to impose additional controls on Campos's overdrafts, namely, delegating the task to Beal (the Bank's Chief Credit Officer) and instructing him to move quickly. But the Comptroller found that Blanton failed even to follow up with Beal to ensure that controls were in place. Final Decision at 14. Indeed, no controls took effect while Blanton served as CEO.

In the end, the Comptroller reasonably concluded that Blanton should have imposed additional controls to mitigate the risk of the overdrafts and that he was reckless in failing to do so. We therefore uphold the Board's determination against Blanton with regard to the Campos overdrafts.

B.

We next consider Blanton's challenge to the Comptroller's determination that he violated the National Bank Act by causing the Bank to file materially inaccurate call reports. Blanton argues that the Comptroller erred in reaching its determination against him on summary disposition because there are material factual disputes pertaining to whether Blanton reasonably believed in the accuracy of the call reports. We agree.

The National Bank Act requires a bank to file periodic call reports with the OCC that describe the bank's financial condition, including the value of its assets and liabilities. *See*

12 U.S.C. § 161(a). Call reports, as noted, must "accurately reflect the capital" of the bank. *Id.* § 1831n(a)(1)(A). The bank officer who signs off on the report must attest "that the report is true and correct to the best of his knowledge and belief." *Id.* § 161(a).

The Comptroller determined that Blanton caused the Bank to file materially inaccurate amended call reports for the December 2009, March 2010, and July 2010 reporting periods by directing the rebooking of the Brooks Avenue and AH&H loans. Final Decision at 20-23. According to the Comptroller, the decision to rebook the loans was improper because the OCC had directed the Bank to charge off the loans (which the Bank initially did) and write off approximately $2.6 million in loan assets from its books. *Id.* As a result, the Comptroller concluded, when the Bank reversed the charge offs and filed the amended call reports in August 2010, those reports overstated the Bank's financial condition by including the original (and higher) value of the loans rather than the reduced value of the loans upon their charge off. *Id.* The Comptroller determined that Blanton violated the National Bank Act by setting in motion the chain of events leading to the amended call reports. *Id.*

The National Bank Act, though, does not impose strict liability on bank officials for the filing of inaccurate call reports. Rather, the statute requires accuracy only "to the best of [the signing official's] knowledge and belief." 12 U.S.C. § 161(a). A bank official, then, does not violate the law if she reasonably believes in the reports' accuracy, even if the reports later prove inaccurate. *See, e.g.*, *First Nat'l Bank of Gordon v. Dep't of the Treasury*, 911 F.2d 57, 63 (8th Cir. 1990).

Blanton argues he reasonably believed that the original loan charge offs were unwarranted and that the amended call

reports accurately reflected the Bank's condition. The Comptroller rejected that argument, reasoning that Blanton had no rational basis for believing in the accuracy of the amended call reports because: the OCC (and the Bank) previously determined that the loans were correctly charged off; the OCC warned the Bank not to reverse the charge offs; and Inserra (the Bank's auditor) equivocated on whether it was appropriate to reverse the charge offs. Final Decision at 25.

In reaching that decision, however, the Comptroller did not resolve two related factual questions bearing on whether Blanton reasonably believed in the call reports' accuracy: first, what was the specific reason for Blanton's decision to reverse the charge offs?; and second, did the OCC's warning not to reverse the charge offs encompass that reason?

First, Blanton and the OCC disagree about his reason for reversing the charge offs and rebooking the loans. According to the OCC, Blanton did so because the Bank had reached an agreement with a Brooks Avenue guarantor and received a tentative commitment from an AH&H guarantor to pledge additional collateral to support the loans.

There is evidence in the record supporting the OCC's account. When Blanton first emailed the OCC about his desire to reverse the charge offs, he cited the guarantors' promise of additional collateral. Also, Knight, the Bank's CFO, in an email to OCC Examiner Lawrence, said that the Bank had reversed the charge offs "due to additional collateral and cash flows from the guarantors." Knight Email to Lawrence, July 13, 2010, J.A. 891.

Blanton responds that his reason for reversing the charge offs was not the guarantors' promises of new collateral, but instead his realization that the charge offs had been improper

all along. According to Blanton, the Bank had unnecessarily classified the loans as "impaired" and "collateral dependent." That is because, as Blanton sees things, the guarantors, at the time of the charge offs, had a reliable source of cash flow and had demonstrated willingness to support loan repayment. Blanton thus contends that the amended call reports accurately reversed charge offs that had been erroneous from the outset.

There is evidence in the record supporting Blanton's account, too. When announcing to the Board of Directors the decision to reconsider the charge offs, Blanton described the process as involving a "second look" at the GAAP to ascertain whether the loans had been properly classified from the beginning. Bank Board Minutes 3, June 15, 2010, J.A. 869. Inserra, additionally, testified before the agency that he believed the Bank had decided to rebook the loans because they had been charged off in error. Indeed, in an email to Knight, Inserra referenced efforts "to convince the OCC [] that [the loans] should never ha[ve] been charged off in the first place." Inserra Email to Knight, July 15, 2010, J.A. 458.

Evidence in the record thus supports both Blanton's and the OCC's competing accounts of the reason he decided to reverse the charge offs and rebook the loans. And that factual dispute is material in light of a second factual issue about the nature of the OCC's warnings to Blanton before the amendments.

According to the Comptroller's determination, Blanton could not have reasonably believed in the amended call reports' accuracy because the OCC had warned him (and others) not to reverse the charge offs. Final Decision at 25. But even assuming Blanton was required to abide by the OCC's warnings, the Comptroller's conclusion about the warnings' significance—i.e, that Blanton could not have reasonably

believed in the amended call reports' accuracy in the face of the warnings against reversing the charge offs—rests on an assumption that the warnings encompassed the reason Blanton decided to reverse the charge offs. Otherwise, Blanton might have reasonably believed that the OCC's warnings did not pertain to the particular circumstances of his decision. In that regard, the record is inconclusive about (and the Comptroller's determination does not resolve) whether the OCC's warnings should have put Blanton on notice that a charge-off reversal would be improper even if he came to understand that the charge offs had been erroneous from the outset.

Those warnings took place on three occasions. The first time, OCC Examiner Lawrence specifically responded to Blanton's inquiry about rebooking the loans based on the guarantors' new pledges of collateral, before Blanton alleges he came to believe that the charge offs had been made in error. The second time, Lawrence said that the OCC does "not usually allow for a charge to be reversed," Knight Dep. 265, Feb 18, 2016, J.A. 383, but that statement similarly came in response to Knight's mention of reversing the charge offs "due to additional collateral and cash flows from the guarantors," Knight Email to Lawrence, July 13, 2010, J.A. 891. The third warning, sent by OCC Examiner Corathers, came after the Bank had already rebooked the loans and filed amended call reports, rendering it of limited use for assessing Blanton's reason for reversing the charge offs.

To be sure, even assuming Blanton reversed the charge offs because he believed they had been incorrect when initially made (rather than because of any new pledge of collateral), Blanton seemingly could have asked the OCC whether its warnings against amending the call reports applied in that situation. But the Comptroller did not suggest in its

determination that Blanton was obligated to do so before directing that the call reports be amended.

We are then left with two related factual disputes bearing on whether Blanton reasonably believed in the reports' accuracy: first, why did Blanton reverse the charge offs?; and second, did the OCC's warnings convey that his rationale would be an impermissible basis for amending the call reports? In that context, it was improper for the Comptroller to reject, on summary disposition, Blanton's assertion that he reasonably believed in the accuracy of the amended call reports—or at least to do so without further explanation of why the factual disputes could be considered immaterial.

Given the dispute about Blanton's reason for reversing the charge offs and about the relevance of the OCC's warnings, the evidence fails to show that the OCC was "entitled to a decision in its favor as a matter of law." 12 C.F.R. § 19.29(a). The Comptroller's issuance of a decision against Blanton on summary disposition thus was "not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). *See also Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986) ("[I]t is elementary that an agency must adhere to its own rules and regulations."). We therefore vacate the Comptroller's determination with regard to the call reports and remand for further proceedings.

\* \* \* \* \* \*

For the foregoing reasons, we grant the petition for review in part, vacate the penalty imposed by the Comptroller, and remand the matter for further consideration consistent with this decision. We note that counsel for the OCC suggested at oral argument that the overdraft-related violation, which we have sustained, could independently support the $10,000 civil

monetary penalty assessed against Blanton.  *See* Oral Arg. Tr. at 32-33.  We have no occasion to consider that issue here, but the agency is free to address it in the proceedings on remand.

*So ordered.*